# REPORTS OF CASES

## DETERMINED IN

# THE SUPREME COURT,

## .APRIL TERM, 1861.

ALBERT PACKARD, Administrator of the Estate of Josefa Arellanes, deceased, v. ANTONIO AREL-LANES and PACIFICO ORTEGA, Executors of Teodoro Arellanes.

UPON dissolution of the community by the death of the wife, the husband has the exclusive right, in his capacity of survivor, to administer the common property, and to take possession and dispose of it for the purpose of settling the community. The wife's interest is not subject to administration under the laws for the settlement of the estates of deceased persons.

The interest of the wife in the common property, while the community exists, is a mere expectancy, and after her death her interest constitutes neither a legal nor an equitable estate; and there is nothing for a Probate Court to act upon.

If, under the statute, the title of the husband upon the death of the wife is divested as to any portion of the common property, such title passes directly to the descendants of the wife, and they take it subject to be absorbed in payment of community debts.

For all purposes connected with the administration of the common property, the debts of the community are to be regarded not as the mere private, individual debts of the husband, but as debts of both husband and wife.

*Query:* How far the common property can be subjected, after the death of the wife, to the payment of the separate debts of the husband.

*Panaud* v. *Jones* (1 Cal. 488) commented on and approved as to its construction of the words "debts of the deceased," in the eleventh section of the Act of 1850, defining the rights of husband and wife.

No special remedy is provided by our statute for the enforcement of the claims of creditors of the community dissolved by the death of the wife, or the protection of persons interested in its property; but the general powers of Courts are adequate to give relief.

APPEAL from the Second District.

In 1812 the respondents' testator married the appellant's intestate, Josefa Arellanes. They cohabited as husband and wife until May, 1851, when the latter died, leaving issue. At that time they owned certain property in common, and particularly 4,000 head of cattle, ranging, according to the custom of the country, in open fields and distinguished by a certain ear-mark and brand, known and recognized as the ear-mark and brand of Teodoro Arellanes.

No letters of administration upon the estate of Josefa were ever taken out, except those granted to the appellant at the beginning of the present year. No distribution of any of her assets was ever made. No debts are claimed to have been paid for her or on behalf of her estate. But her surviving husband retained possession of the whole property, managing and disposing of it as his own; and on or about the 15th of February, 1854, the children and heirs executed and delivered to the father an instrument, of which the following is a translation, the original being in Spanish:

"Be it public and notorious to all those who may see and hear these presents, that we give power, ample, sufficient, and whatever may be necessary, to our well beloved father, Don Teodoro Arellanes, that he may ' *disponga* ' or make, as he deems most convenient, the distribution of the property which by law belonged to our late mother, Doña Josefa Rodriguez de Arellanes, who, on the point of death, manifested her desire that our said father should make the will which she had a right to make; and we, respecting, as is due, her last desires—although not set down in writing—do give and grant, of our free and spontaneous will, the present power, ratifying all that our said father should deem fit to do with said property, which belonged to us by inheritance, renouncing in his

favor all the rights which we have as heirs of such property. In testimony whereof, we sign these presents at Santa Barbara, the 15th of February, 1854.

MARIA IGNACIA ARELLANES,                †

LUIS ARELLANES,                †

FRANCISCO ARELLANES,                †

MARIA DE LAS REIES ARELLANES, †

FRANCISCA MARCELLA RODRIGUEZ, ⎰

I sign for my mother, Mᵃ Arellanes, dec'd. ⎱ †

Atᵒ ARELLANES."                †

On the 8th of October, 1856, the said Teodoro Arellanes executed to his son, Antonio Arellanes, a lease of a certain rancho-called Guadalupe, therein described, " and all the stock," etc., for the term of five years, at the yearly rent of $4,000, and in consideration of taxes being paid by the lessee.

Teodoro Arellanes, on the 16th of May, 1858, made his will, and departed this life soon afterward. The will was admitted to probate, and letters were issued to the respondents.

Soon afterward letters of administration of the estate of Josefa Arellanes were issued to appellant, who, being duly qualified, presented to respondents his claim, demanding $83,560, as the value of personal property belonging to the estate of Josefa.

By consent of parties, the matter was sent to a referee, who reported that there were $59,000 due from the estate of Teodoro Arellanes to the estate of Josefa Arellanes. This report was set aside and another referee appointed, who found that the increase of the 2,000 head of cattle—one-half of the number at the death of the wife—up to the time of the filing of plaintiff's claim in this proceeding, is 5,127 head, making 7,127 head of cattle belonging to the estate of Josefa, and that they are now worth fourteen dollars per head—in all, $63,759.65, for which sum he reported judgment in favor of plaintiff. Both parties moved to set aside the report, and upon the motion the Court delivered, upon the main question, the following opinion, to wit:

" It is not pretended there was any separate property belonging to the estate of Josefa Rodriguez. The referee has considered that one-half of that belonged to his wife, and the other part to

Teodoro Arellanes, her husband; and that at her death 2,000 head of cattle formed a part of her estate—a separate and distinct estate—and that Teodoro Arellanes had no right to dispose of any part of that property. It appears that when she died they owed nothing, neither she nor he. Afterwards, there never was any distribution of the 4,000 head of cattle, but they remained in the possession of Teodoro Arellanes. The plaintiff introduced in proof, before the referee, an instrument of lease made by Teodoro Arellanes the eighteenth day of October, 1856, by which he leased to Antonio Arellanes, for five years, these cattle, calculated then at 6,000 head, for $4,000 per year, and payment of taxes. It does not appear that until now the defendants have received any part of that property in the character of executors; but that they are still in the possession of the lessee. The plaintiff insists that the defendants are responsible to him for the value of the one-half of the property which existed when Josefa died, and for the value of its increase since that epoch. He adopts the idea that the one-half that existed at her death descended to the children of the marriage. The children of the marriage, whom he represents in this suit, (and it seems there are no creditors) if they have a right as heirs, have it by virtue of the law of this State, passed April 17th, of the year 1850. The Mexican law cannot govern in deciding this matter, because it was abrogated before her death, and before they acquired the character of heirs. That law which is in force, only applies to property acquired since its passage, as is clearly seen in section fifteen of the same law, and cannot include property acquired before its date. What property was acquired by Teodoro Arellanes and his wife, between the date of the passage of that Act and the time of her death? This does not appear from the proofs taken before the referee. We are to believe that there was some, viz.: the natural increase of the animals that existed at the time of the passage of the law.

" There was in proof the testament of Teodoro Arellanes made shortly before his death in the year 1858. The testator has given all his property to his children, except a small part given to a son-in-law; and the value of the part given to the latter (who is one of his executors) probably does not equal the fees given by law to executors.

" If it be thought that the Mexican law governed the disposal of this property, because they married under those laws, and because it was under those laws that the greater part of the property was acquired, we see in the decision of the Supreme Court in the suit of *Panaud* v. *Jones*, (1 Cal. 488) that the wife dying and the husband surviving, the children of the family do not acquire the right to inherit the common property. The facts of that suit are very similar to those of this, and you may almost efface the name of Alviso in that decision, and substitute the name of Arellanes, changing the year 1846 to that of 1858.

" In that decision, the Judge cites Ley 14th of Toro, the same as Ley 6th, tit. 10 of the Novissima Recopilacion and No. 2775 of the Pandectas Mejicanas, (vol. 2, 488) that declare that the marriage being dissolved by the death of either husband or wife, the survivor may freely dispose of the bienes gananciales, although he or she may enter into a second or third marriage, and children of the first marriage be living, without being obliged to reserve for such children either the property or proceeds of such gananciales."

The Court then goes on to hold that the writing hereinbefore named, signed by a portion of the children, renounced all their interest in the estate of their mother, and authorized their father to dispose of it as he thought best.

The report of the referee was set aside and judgment entered for defendants. Plaintiff appeals.

*Eugene Lies*, for Appellant.

I.   The title to one-half of all the common property passed to Josefa's heirs at her death in 1851, by virtue of the statute of April 17th, 1850, notwithstanding the case of *Panaud* v. *Jones*, or rather in accordance therewith.

It matters not whether the Mexican law is to govern this case or not. We show that at the death of Josefa there were 4,000 head of cattle in the possession of respondents' testator ; and it was incumbent on them to show that a given number only had been acquired since the passage of the Act of April 17th, 1850, and then they could have made their point under section fifteen of that act. Otherwise it will be presumed that the whole was subject to

the operation of that law.   (*Alvarez* 2, 109, L. 1, tit. 9. lib. 5, R.; *Febrero* 76, L. 1 and 4, tit. 4, lib. 10, N. R.; 12 Cal. 216.)

But, so far as regards personal property acquired during marriage, the statute in question was only a reënactment of the law then in force in California.   (*Panaud* v. *Jones,* 1 Cal.)

The only change that any one claims has been made by the act in question, is in the method of disposing of the common property, after dissolution by death of the community.   During their joint lives, husband and wife have the same interest in the common property as they had under the Mexican law; but at the death of either, the property, under our law, must be divided; whilst, under the Mexican law, the survivor retained its control and full power of disposal, as some claim.   But in no authority do we discover any intimation that the Act of April 17th, 1850, operated to divest Josefa Arellanes of her feigned dominion or other interest which she then had in property then acquired, without giving her an equivalent.

I am willing to concede—because I do not conceive that the point is involved here—that, by the Mexican law, a surviving spouse could dispose of the common property.   It seems to have been a common practice here; but whether this was the result of statute or custom, we perceive its justification in the surviving spouse's inability to dispose by will of any but a small proportion of the property in his hands, whether common or separate, to the prejudice of his natural heirs, or to prefer any one to the others, save in rare and exceptional cases.   The question of right of disposal was scarcely one of paramount interest; and by whatever shadowy designation of feigned dominion or defeasible right the Spanish jurists call the mother's title, her heirs knew that the property must descend to them, and that their father managed it as their senior partner.   (*Vide Escriche, article Gananciales.*)

But by the several enactments of 1850, the whole system was overturned, except, we contend, as to ownership of property acquired during marriage.   The wholesome checks of the Mexican law were removed.   The surviving parent's hands were set free. Yet as a necessary consequence of that increased liberty, additional duties must be imposed upon him.   It mattered but little, before,

whether he strictly administered or not upon his wife's estate, or mixed her assets with his own, since the whole bulk must, after his death, revert to the same heirs.    But now this reversion has ceased to be certain, some means must be devised to guard the rights of his wife's heirs at law, and therefore the act to regulate the settlement of the estates of deceased persons was passed.    The change of law, then, while it did not in any respect alter the relative share of Josefa Arellanes in the common property, affected the whole question of its immediate custody and disposal after her death. This change consists in a method of administration, and the instantaneous descent provided by statute.

As to the writing by the heirs, "renouncing" their interest, as the Court below held, it only conveyed at most the distributive share of each party signing it.    But even then, the estate of Josefa is first to be administered upon, all its assets collected, its debts, if any, paid, its expenses of administration satisfied; and then the residue will be ready for distribution.    The estate of Teodoro, as assignee of those heirs who signed the document, will come in for its share, if the conveyance can be sustained.    At present it cannot set up the conveyance in bar of this action or proceeding.

[In support of the foregoing view as to the effect of our statute upon the distribution of the common property, Mr. Lies annexed to his brief a translation of a chapter from the Novissima Recopilacion, which the Reporter inserts for reference.]

"Novissima Recopilacion, vol. 4, page 224, 5, 6; lib. 10, tit. 4. Of gananciales or property acquired during marriage.

"Law I.    Fuero Real Law 1, tit. 3, lib. 3.    Mode of dividing between husband and wife the property acquired during marriage.

"Everything the husband and wife may earn or purchase during union, let them both have it by halves; and if it is a gift of the King or other person, and given to both, let husband and wife have it; and if he give it to one, let that one alone have it to whom it may have been given.    (R. Law 2, tit. 9, lib. 5.)

"Law II.    Fuero Real Law 2, tit. 3, lib. 3.    Property common to husband and wife, and that belonging to each one for himself.

"If the husband should earn anything by inheritance from father or mother, or other near relative; or by gift from lord, relation, or

friend, or in the army of the King, or of another in his pay, let him have everything he may earn for himself; and if he be in the army without pay, at the expense of himself and his wife, whatever he may earn in this way, be it all the husband's and wife's; for even as the cost is common to both, let what they may earn in that way be common to both. What above is said of the earnings of husbands, let the same be as regards those of wives. (R. Law 3, tit. 9, lib. 5.)

" Law III. Fuero Real Law 3, tit. 3, lib. 3. Let the fruits of the separate property of the husband or of the wife be common.

" Although the husband may have more than the wife, or the wife more than the husband, in real estate or in personal, let the fruits be common to both; and let the realty or other things whence the fruits proceed go to the husband or wife who owned them before, or the heirs of him or her. (R. Law 4, tit. 9, lib. 5.)

" Law IV. Law 203 of Estilo and Philip II, the year 1566. Let the property which husband and wife have be presumed common, its respective ownership not being proved.

" Albeit that the law may say, that all things which husband and wife have are all presumed to belong to the husband, until the wife shows that they belong to her; nevertheless, the custom observed is on the contrary, that the property which husband and wife have belong to both by halves, except that which each one may prove to be his separately; and so we order that it be observed as a law. (R. Law 1, tit. 9, lib. 5.)

" Law V. Don Enrique IV, at Nieva, the year 1473, pet. 25. Of common property and that belonging to the husband and wife, in declaration of the former laws of the Fuero and Estilo.

" Declaring (maintaining) the laws of the Fuero and what is contained in the book of Estilo de Corte, and the other laws which govern the method which is to be had touching property earned between husband and wife during marriage, I order and ordain that all and any property resulting from military service, (*bienes castrenses*) royal offices, and gifts that shall have been earned, and improved, and held during the marriage between the husband and wife by one of them, be and remain the property of the one that may have earned the same without the other having any part thereof,

as required by the said laws of Fuero; but that the fruits and income of the same and every other office whatever, although of the class which the law has considered as semi-military, (*casi castrenses*) and the other property that have been earned or improved during marriage, and the fruits and income of such military property, offices, and gifts belonging to both in common. And likewise, that the property earned, improved, and multiplied during the marriage between the husband and wife, not being military or semi-military, may be alienated by the husband during the marriage, if he will, without license or conveyance of his wife, and that the contract of alienation be valid, save it be proven that it was done fraudulently, to defraud or injure the wife. And likewise, I order and ordain, that if the wife remain a widow, and being a widow, live lustfully, she shall lose the property which she got by reason of her half of the property that was earned and improved by her husband and herself during the marriage between them; and that the said property be returned to the heirs of her deceased husband in whose company they were earned. (Law 5, tit. 9, lib. 5, R.)

" Law VI.* Law 14 of Toro.—Power of the surviving consort to dispose of the property multiplied during marriage, without necessity of reserving it for the children of the same.

" We order that the husband and the wife, the marriage being dissolved, although they may marry a second or third time, or more times, may dispose freely of the property multiplied during the first, or second, or third marriage, although there may have been children of such marriages, or one of them, during which marriages the said property was multiplied in the same way as of their other property, which was not of earnings, (*de ganancia*) without being obliged to reserve to such children the ownership nor the usufruct of the said property. (R. Law 6, tit. 9, lib. 5.)

" Law VII. Law 15 of Toro. Cases in which parents who contract a second marriage must reserve† to the children of the first the ownership of the property of the deceased.

---

*The expression *reservar*, translated herein by *reserve*, has a technical meaning which the English does not convey.

†The original word *reservar* has a peculiar meaning which, to be understood, requires a study of the Spanish doctrine of *bienes reservables*. See Feb. 2, 93.

" In all the cases where the women who contract a second marriage are obliged to reserve to the children of the first marriage the ownership of what they get from the first husband, or inherit from the children of the first marriage, in the same cases let the man who may marry a second or third time be obliged to reserve the ownership of the same to the children of the first marriage ; so that the rule established touching this case for women who marry again, shall apply to the man who contracts a second or third marriage.    (R. L. 4, tit. 1, lib. 5.)

" Law VIII.    Law 15 of Toro.    The property bequeathed by the husband to the wife is not comprised in the half she is to get of the gananciales.

" If the husband bequeath anything to his wife at the time of his death or will, let it not be counted in the part which the wife is to get of the property multiplied during the marriage ; but let her have such half of the property and the bequest at its lawful value. (R. Law 7, tit. 9, lib. 5.)

" Law IX.    Law 60 of Toro.    Let the wife renouncing the profits, (*ganancias*) not have to pay the debts contracted by the husband during the marriage.

" When the wife renounces the profits, (*ganancias*) let her not be obliged to pay any part of the debts which the husband should have made during the marriage.    (R. Law 9, tit. 9, lib. 5.)

" Law X.    Law 77 of Toro.    Neither of the consorts for the crime of the other shall lose the property increased, until the declaratory sentence.

" On account of the crime which the husband or the wife may commit, though it may be heresy, or of any other nature, let not the one, by reason of the other's crime, lose his own property, nor the half of the earnings got during the marriage ; and we order that all the increase during the marriage be held as *bienes de ganancia*, until for such crime the property of either of them be declared (specified ?) by sentence, and this although the crime be of nature that imposes the penalty *ipso jure*.    (R. Law 10, tit. 9, lib. 5.)

" Law XI.    Law 78 of Toro.    The wife may lose, by reason of crime, the *gananciales* and other property that belongs to her.

" The wife, during the marriage, may, by reason of crime, lose

in part or in whole her dowry and earnings, or other property, of whatever nature it may be." (R. Law 11, tit. 9, lib. 5.)

Laws XII and XIII, with which this title ends, are strictly local; one declares that the custom of the Baylio shall be law in the city of Albuquerque, and the other abrogates the custom of Cordova, where married women get no part of the gananciales.

This is all the Spanish legislation I have been able to discover, except that Eugenio de Tapia, in his *Febrero Novisimamente Redactado* 2, 329, says that the following law of Fuero Real is still in vigor:

"Because it happens often that before the fruits are gathered from the estate the husband dies or the wife dies, we establish that if the fruits appear upon the estate (*heredad*) at the season of the death, let them be parted by halves between the survivor and the heirs of the deceased."

The reference is L. 10, tit. 4, lib. 3; but there is no Fuero Real in the library.

*C. E. Huse, Attorney, and Saunders & Campbell, of counsel,* for Respondents.

I. No administration on the community property of the wife can be taken out after her death, and even after the death of her husband, acquired either before or after the passage of the Act of April 19th, 1850. Such administration must be confined to the separate estate of the wife. (Wood's Dig. 737, sec. 2; Id. 396, sec. 82; Id. 689, sec. 13; Id. 411, sec. 196; *Panaud* v. *Jones*, 1 Cal. 519.) The husband has the right to use the common property in payment of the community debts, and also of his own debts, after the wife's death; and this right is inconsistent with any right in the administrator of the wife to take from the husband this property.

II. Even if administration can be had on the common property of the wife, it is confined to property acquired after April 17th, 1850, the date of our Husband and Wife Act. (*Ingoldsby* v. *Juan*, 12 Cal. 564; *Grimes* v. *Norris*, 6 Id. 625; *Panaud* v. *Jones*, 1 Id. 519; *Buchanan's Estate*, 5 Id. 507; *Scott* v. *Ward*, 13 Id. 458; *Beard* v. *Knox*, 5 Id. 256; *Dye* v. *Dye*, 11 Id. 160.)

III.    There appearing no debts of the wife, the conveyance from her heirs to the husband and father vested the property in him. (Escriche, 1435, Renuncia; 2 Domat's Civil Law, sec. 2735, 2783.)

COPE, J. delivered the opinion of the Court—FIELD, C. J. and BALDWIN, J. concurring.

The only question we propose to consider in this case is, whether upon the dissolution of a marriage by the death of the wife, one-half of the common property is subject to administration under the provisions of the act regulating the settlement of the estates of deceased persons.    Section fifty-two of that act provides generally for the granting of administration of the estates of all persons dying intestate ; and section one hundred and ninety-four requires the administrator to take possession of all the property, real and personal, belonging to the estate.    The solution of this question depends upon the construction to be given to certain provisions of the Act of April, 1850, defining the rights of husband and wife.    The second section of this act declares what shall be common property ; and section nine gives to the husband the entire control and management of such property, with the like absolute power of disposition as of his own separate estate.    The eleventh section is as follows : " Upon the dissolution of the community by the death of either husband or wife, one-half of the common property shall go to the survivor, and the other half to the descendants of the deceased husband or wife, subject to the payment of the debts of the deceased.    If there be no descendants of the deceased husband or wife, the whole shall go to the survivor, subject to such payment."

Various difficulties suggest themselves in the construction of the eleventh section of this act.    In *Panaud* v. *Jones* (1 Cal. 488) Mr. Justice Bennett remarked in reference to this section, that it was manifestly a deviation from the civil and Spanish law, unless the words " debts of the deceased " could be construed as including all debts of the community contracted for the common benefit, whether by the deceased or by the survivor.    " If this construction may be put upon it," said he, " then it is consistent with the civil and Spanish law ; and what is more, is consistent with reason and justice."    These suggestions were not called for by any question

involved in that case; but our opinion is that the view intimated as to the meaning of the words referred to, was based upon a correct interpretation of the intention of the Legislature, and we therefore adopt it as a just and reasonable construction of the section in this respect. Our whole system by which the rights of property between husband and wife are regulated and determined, is borrowed from the civil and Spanish law, and we must look to these sources for the reasons which induced its adoption, and the rules and principles which govern its operation and effect. The relation of husband and wife is regarded by the civil law as a species of partnership, the property of which, like that of any other partnership, is primarily liable for the payment of its debts. "The law," says Schmidt, in his work on the civil law of Spain and Mexico, "recognizes a partnership between the husband and wife as to the property acquired during marriage." The same doctrine is laid down by many other writers, and such seems to be the universal understanding of the nature of the marital relation in matters of property as viewed by the civil law. It is the well settled rule of that law that the debts of the partnership have priority of claim to satisfaction out of the community estate. (*Jones v. Jones*, 15 Tex. 143, and authorities there cited.) Whether this rule prevails to its full extent under our statute it is unnecessary to determine, but it is certain that the Legislature intended to establish a similar relationship as to property to that existing in the civil law. The contracting of debts is one of the incidents of that relationship, and it would be unreasonable to suppose that the intention was to do away with so important a principle as that of the liability of the community property for their payment. We think that for all purposes connected with the administration of such property, the debts of the community are to be regarded, not as the mere private and individual debts of the husband, but as obligations involving the liability of each of the members of the community. It may become a question to what extent the property held in common can be subjected after the death of the wife to the payment of the separate debts of the husband, but this question is not before us, and it is unnecessary to express any opinion in regard to it. In *Van Maren v. Johnson* (15 Cal. 308) we held that the common property was lia-

35

ble, during the marriage for the debts of the wife contracted prior to the coverture ; and, of course, similar debts of the husband would stand upon the same footing.   But the statute provides, that upon the dissolution of the marriage by the death of one of the parties, the descendants of such party shall take one-half of the common property, " subject to the payment of the debts of the deceased."   If the dissolution is caused by the death of the husband, there is no doubt that the whole property is liable for the payment of his debts, and we have expressly so held ; but where the marriage is dissolved by the death of the wife, it is by no means clear that her descendants are not entitled to one-half of the property, free from any claim on the part of the creditors of the husband, unless they are also creditors of the community.   It is, however, unnecessary to pursue this subject, as we do not propose to express any opinion upon the point.   The property of the community is undoubtedly liable for the payment of its debts ; and the question is, by whom and in what manner such property is to be administered, upon the dissolution of the community by the death of the wife.

During the marriage the husband is the head of the community, and the law invests him with discretionary power in all matters pertaining to its business or property.   In fact, its business is conducted and its property acquired in his name, and his authority in the administration of its affairs is exclusive and absolute.   The wife has no voice in the management of these affairs, nor has she any vested or tangible interest in the community property.   The title to such property rests in the husband, and for all practical purposes he is regarded by the law as the sole owner.   It is true, the wife is a member of the community, and entitled to an equal share of the acquests and gains ; but so long as the community exists her interest is a mere expectancy, and possesses none of the attributes of an *estate*, either at law or in equity.   This was held in *Van Maren* v. *Johnson*, before referred to, where the interest of the wife was compared to that which an heir may possess in the property of his ancestor.   The same doctrine prevails in Louisiana, and appears to be an established principle of the civil and Spanish law.   In *Guice* v. *Lawrence* (2 La. Ann. 226) the Court said: " The laws of

Packard *v.* Arellanes.

Louisiana have never recognized a title in the wife during marriage to one-half of the acquests and gains. The rule of the Spanish law upon that subject is laid down by Febrero with his usual precision. The ownership of the wife, says that author, is revocable and fictitious during marriage. As long as the husband lives and the marriage is not dissolved, the wife must not say that she has *gananciales*, nor is she to prevent the husband from using them, under the pretext that the law gives her one-half.   *   * The husband is, during marriage, *real y verdadero dueno de todos, y tiene en el efecto de su dominio irrevocable.*" Under the civil and Spanish law, the estate of the wife, upon her death, becomes entitled to one-half of the ganancial property, and the same rule exists, by statutory enactment, in Louisiana and Texas, where the mode of administering the community estate is specially provided. We have in this State no statute of a similar import ; and, in view of the legal position of the parties during marriage, we do not see upon what principle the intangible interest of the wife can be regarded as a part of her estate. It would be absurd to attribute to her death the effect of transforming this interest into a legal right, and impressing upon it the character of a title in her representatives. The interest secured to her by the statute only vests upon the death of her husband ; and whether it is ever to assume a legal shape depends upon the contingency of her being the survivor. Where the marriage is dissolved by her death, her descendants succeed to the interest to which she would otherwise be entitled. They do not, however, succeed to such interest as a portion of her estate, but because it is vested in them by the statute. It is suggested that, in this respect, the statute is an unconstitutional infringement of the rights of the husband, but we do not perceive the force of this suggestion. It is true, the husband, so long as the marriage exists, is regarded as the owner of the whole property ; but his rights of ownership are derived from the statute, and he holds the property subject to its provisions. We think the objection cannot therefore be sustained ; but to what extent the rights of the husband are affected by a dissolution of the marriage, it is unnecessary to determine. There is no doubt that he is entitled to represent the community in the settlement of its affairs, and pos--

sesses the authority necessary to enable him to do so. He has the right, of course, to the possession and control of the property, and the power to make any disposition of it required for the purposes of the settlement. This appears to be the rule of the Spanish law, and even in Louisiana and Texas, where a different mode of administration is provided by statute, the authority of the husband, as survivor, to discharge the debts of the community, and to dispose of the community property for that purpose, has been repeatedly recognized. Thus in *Jones* v. *Jones*, the Supreme Court of Texas, after stating that the community debts had priority of claim to satisfaction out of the community estate, and that no administration had been taken out in accordance with the statute, proceeded to say : " The ganancial estate remained in the hands of the surviving husband. As survivor he had competent authority to discharge the debts of the partnership; and whether the discharge of debts, or any act which he might lawfully do as survivor, be done in his own name simply, or in his name as survivor, is immaterial.   *   * Nor can the fact that the husband, since the death of his wife, has disposed of a large portion of the community property, affect the right of the creditor to satisfaction out of that which has not been sold. What were the motives and inducements to the various sales made by the survivor, we are not informed. They may have been made to discharge contracts made prior to the death of the wife, or to satisfy legitimate demands against the community. If so, it is apprehended that they could not be disturbed." So in *Primm* v. *Barton*, the same Court, in referring to *Jones* v. *Jones*, said : " We have hitherto had no reason to be dissatisfied with these doctrines, and believe that such powers are fairly within the scope of the authority which, on reason and principle, must legitimately appertain to the survivor." The Court adds, however, that " these remarks refer to the power of the survivor prior to the grant of administration on the estate. After such administration under the present laws, the estate must take the course prescribed by the statute." (18 Texas, 206.) In the matter of the succession of McLean (12 La. Ann. 222) the Court said : "As the husband is responsible for the debts of the community, and must answer for the same out of his separate estate, if the community is insufficient,

and as the wife may renounce and claim that her paraphernal rights shall be paid out of his estate, the settlement of the community is a natural consequence of the settlement and payment of the debts of his succession." It is evident that under our statute the husband has the exclusive right to administer the community estate, and we are satisfied that the only character in which he can do so is that of survivor. No other mode of settlement has been provided, and we think there is nothing sufficiently tangible in the interest of the wife to become the subject of proceedings in probate under existing laws. Such interest constitutes neither a legal nor an equitable estate, and there is, therefore, nothing in it for a Court of Probate to act upon. If, under the statute, the title of the husband, upon the death of the wife, is divested as to any portion of the property, such title passes directly to the descendants of the wife, and they take it subject to the liability of the property to be absorbed in the payment of debts. No special remedy exists for the enforcement of the claims of creditors, or the protection of persons interested in the preservation of the property; but the general powers of the Courts are sufficient to furnish any relief necessary for these purposes.

Judgment affirmed.