[No. D016555. Fourth Dist., Div. One. Mar. 21, 1995.]

In re the Marriage of JUDY and CLARENCE HAINES.
JUDY A. HAINES, Appellant, v.
CLARENCE HAINES, Respondent.

## Counsel

Sharron Voorhees for Appellant.

Kim W. Cheatum as Amicus Curiae on behalf of Appellant.

Stephen E. Hartwell for Respondent.

## Opinion

HALLER, J.—This case presents the issue of whether Evidence Code[1] section 662, the common law presumption in favor of title, and its concomitant requirement of clear and convincing evidence to rebut the presumption, properly apply in family law proceedings when there is a conflict with the presumption that a husband and wife occupy a confidential relationship in their transactions with each other.

Judy A. Haines appeals a portion of a judgment of dissolution entered November 1, 1990, granting Clarence Haines reimbursement for his separate property contribution to the acquisition of the couple's residence.

Judy's major assignment of error is the trial court improperly applied section 662, holding her to the burden of clear and convincing evidence in her attempts to void a 1987 quitclaim deed in which she deeded her interests in the residence to Clarence. Clarence later conveyed the residence to

---

[1] All subsequent statutory references are to the Evidence Code unless otherwise specified.

himself and Judy as joint tenants, thereby restoring the status of the residence to community property, which was the status of the property at the time of the dissolution. In the dissolution proceeding, the trial court awarded Clarence reimbursement for this separate property contribution. Among other things, Judy argues preponderance of the evidence, a burden she successfully met below, is the appropriate burden of proof in proceedings under the former Family Law Act.[2]

Amicus curiae presents two arguments. First, it questions whether section 662 ever applies in marital disputes. Alternatively, it argues that if section 662 does apply, it conflicts with—and must yield to—the presumption arising from the requirement that a husband and wife occupy a confidential relationship in their transactions with each other (see former Civ. Code, § 5103 [Fam. Code, § 721]). Finding merit in this latter argument, we conclude section 662 should not apply in marital proceedings when such a conflict appears.

## FACTS

Judy and Clarence married on November 13, 1981. They had been married seven years and four months when they separated on March 6, 1989. During the marriage, the family residence was at 7613 Teebird Lane in San Diego.

Clarence purchased the Teebird Lane residence in May 1978, while married to his previous wife, Elsa. Elsa's mother supplied the down payment of approximately $31,650; in return, she was to live in the house with the couple and would be repaid eventually. Title was taken in the name of Clarence and Elsa. Thereafter, Clarence and Elsa were divorced; as part of the divorce, Clarence received sole title to the Teebird Lane residence. This transfer was evidenced by a quitclaim deed signed by Elsa on October 9, 1980, and recorded on October 27, 1980.

After Elsa moved out of the Teebird Lane residence, Elsa's mother continued living there, along with Clarence and her two grandchildren, for nine months until November 28, 1981. This was two weeks after Judy moved into the residence following her marriage to Clarence. In 1982, Elsa's mother filed suit against Clarence to recover her down payment. The lawsuit

---

[2]The former Family Law Act (former Civ. Code, § 4000 et seq.) was enacted in 1969, operative January 1, 1970. (Stats. 1969, ch. 1608, § 8, p. 3314.) Effective January 1, 1994, the Civil Code provisions were repealed and reenacted in various sections in the new Family Code. (Stats. 1992, ch. 162, § 10; Stats. 1993, chs. 219, 876.)

Since the parties briefed this case in 1993 with references to then existing Civil Code sections, we shall quote the former Civil Code sections as well, with references, where it is applicable, to the Family Code [in brackets], where it is applicable.

was settled on November 1, 1983; Clarence agreed to pay Elsa's mother $31,500.

On November 25, 1983, Clarence conveyed the Teebird Lane residence by quitclaim deed to himself and Judy as joint tenants. The conveyance was necessary to qualify for a refinance loan, the proceeds of which were used to pay off the settlement of the lawsuit by Elsa's mother. Trial exhibit G showed that the new loan and costs totaled $80,210; $31,500 of that amount was paid to Elsa's mother, $45,982.10 was paid to Downey Savings, the existing lender, and the remaining amount was attributed to costs associated with the refinance. Judy testified that after the 1983 refinance, she understood that she and Clarence both owned the house.

In October 1987, the marriage of Judy and Clarence began deteriorating. There was mounting tension between Judy and Clarence, physical confrontations and talk of separation and divorce. During this period, Clarence asked Judy to sign a quitclaim deed returning ownership of the Teebird Lane residence to him. According to Judy, the conversations concerning the signing of the deed were highly emotional, with Clarence "ranting and raving." She also testified that Clarence pulled her hair and threw water in her face during one episode. Clarence denied this episode took place. He characterized the discussions about the quitclaim deed as calm and business-like.

On October 21, 1987, Judy asked Clarence to co-sign a loan to purchase an automobile. There was one car in the household, which was under Clarence's control, and if Judy was to be on her own, she needed a car for herself. The day before Judy had sought a car loan at the credit union and was told she needed a cosignatory. Clarence agreed to co-sign the loan when Judy made the request. They made arrangements to go to the credit union the next day.

On October 22, 1987, while en route to the credit union, Clarence stopped at a check cashing store that had a notary service. Once inside the store, Clarence told Judy they had to take care of the quitclaim deed; when Judy protested, Clarence, in effect, told her that if she did not sign the quitclaim deed he would not co-sign the automobile loan. Judy signed the quitclaim deed, which conveyed her interest in the Teebird Lane residence to Clarence as his sole and separate property, because she believed she had no alternative.

Judy testified she did not know Clarence was going to stop at the check cashing store and demand she sign the quitclaim deed; she thought it was unfair and told him so.

Clarence testified that on October 22 he and Judy planned to take care of two things: the quitclaim deed, and the automobile loan. The decision to stop at the check cashing store to notarize the quitclaim deed was a completely spontaneous decision, Clarence testified. Clarence also testified that once he produced the quitclaim deed inside the check cashing store, Judy voluntarily signed the deed without any discussion; he denied he conditioned his co-signing the automobile loan on Judy signing the quitclaim deed.

Judy and Clarence then proceeded to the credit union, where they signed the application for the automobile loan. Shortly thereafter, Judy moved out of the Teebird Lane residence and lived with two friends in a rented house for two days. On October 31, 1987, Judy moved back to the Teebird Lane residence because Clarence asked her to return. The night before, Judy testified, she and Clarence had gone to dinner at a restaurant where he had apologized for making her sign the quitclaim deed and said he would put her name back on the deed. Clarence denied telling her at that dinner that he would restore her ownership interest in the Teebird Lane residence.

On April 28, 1988, Clarence signed a grant deed conveying the house back to himself and Judy as joint tenants. At that time, Clarence and Judy were contemplating purchasing property in Missouri and applied for a loan.

Judy and Clarence separated on March 6, 1989. Judy filed a petition for dissolution of marriage on March 21, 1989. The matter was tried on March 12, 13 and 14, 1990.

The trial court found the Teebird Lane residence was community property by virtue of the April 28, 1988, deed. However, the court also found that at the time Clarence deeded the residence to Judy and himself, it was his separate property by virtue of the October 22, 1987, quitclaim deed, and therefore, pursuant to then Civil Code section 4800.2,[3] Clarence was entitled to reimbursement for his separate property contribution to the acquisition of

[3]Former Civil Code section 4800.2 [Fam. Code, § 2640] provided: "In the division of community property under this part unless a party has made a written waiver of the right to reimbursement or signed a writing that has the effect of a waiver, the party shall be reimbursed for his or her contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and shall not exceed the net value of the property at the time of the division. As used in this section, 'contributions to the acquisition of the property' include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property."

community property. The trial court stated on the record that it found Judy had not met the clear and convincing burden of proof under section 662 in her attempts under theories of undue influence, duress, deceit and constructive fraud to set aside the 1987 quitclaim deed. However, the trial court stated Judy had met the lesser evidentiary standard of preponderance of the evidence regarding her claims.

Based upon appraisal values submitted by the parties, the trial court found the value of the property was $165,000 at the time Clarence conveyed the property back to himself and Judy[4] and was $201,000 on the date of the trial. The trial court further found the community property interest in the property at trial to be approximately $36,000 ($201,000 minus $165,000). The trial court awarded Judy one-half of that amount or $18,000 as her share of the community property interest. The amount of the debt on the property on the date of trial was $80,392.49. The trial court awarded as Clarence's reimbursement all equity in the property except the amount of $36,000. Since the amount of the debt on the property on the date of trial was $80,392.49, the value of Clarence's reimbursement award was approximately $85,000 ($201,000 minus $36,000 minus $80,392.49).

## DISCUSSION

### I. *Introductory Overview*

■■■ This appeal arises from the effects of the 1987 quitclaim deed by which Judy deeded her interests in the Teebird Lane residence to Clarence. For the parties, the key question was whether, as a result of the quitclaim deed, the residence became Clarence's separate property and thereby justified a reimbursement award under former Civil Code section 4800.2 (Fam. Code, § 2640). In short, it is a classification or characterization of property issue—whether the residence was community property or separate property after the 1987 deed was executed.

---

[4]We have augumented the record on appeal to include exhibit A and its addendum, which lists $165,000 as the appraised value of the residence on April 28, 1988. (See Cal. Rules of Court, rule 12(a).) We have made this augmentation to resolve an ambiguity in the record on appeal and an apparent error on page 5 of attachment 4f to the judgment, which states: "The value of the residence and real property in October 1987 was $165,000." The reporter's transcript indicates the trial court used the $165,000 figure to refer to the appraised value when Clarence conveyed "the property into joint tenancy," which apparently refers to the reconveyance deed. However, the reporter's transcript also indicates the trial court said this occurred in October 1987, which, of course, was when Judy signed the quitclaim deed making the residence Clarence's sole property.

The quitclaim deed of course was not executed in a vacuum but rather between two spouses, and, consequently, must be considered in the legal context of the marital relationship.[5]

On one hand, we are presented with an executed quitclaim deed that raises the common law presumption of title. On the other hand, we are presented with a factual scenario in which Judy received Clarence's co-signature in exchange for her 50 percent interest in a residence. Under California community property law, because spouses occupy confidential relations with each other, when an interspousal transaction advantages one spouse over the other, a presumption of undue influence arises. (See former Civ. Code, § 5103, subd. (b) [Fam. Code, § 721, subd. (b)]; *Estate of Cover* (1922) 188 Cal. 133, 143-144 [204 P. 583].)

Clearly, under the facts of this case, the common law presumption of title and the community property presumption of undue influence are in conflict. Our task is to resolve that conflict.

As we shall explain below, we conclude the public policy of the state, as enunciated by statute and case law interpretation, demands that where there is a conflict between the common law presumption in favor of title as codified in section 662 and the presumption that a husband and wife must deal fairly with each other, application of section 662 is improper. In reaching this conclusion we have considered a number of interrelated concepts that are basic to modern community property law and must be given primacy in the context of a marital proceeding.

## II. *The Unique Status of Marriage*

█ It is the public policy of this state "to foster and promote the institution of marriage." (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 683 [134 Cal.Rptr. 815, 557 P.2d 106].) "[T]he structure of society itself largely depends upon the institution of marriage . . . ." (*Id.* at p. 684.)

Recently, the Court of Appeal in *Borelli* v. *Brusseau* (1993) 12 Cal.App.4th 647, 651 [16 Cal.Rptr.2d 16] observed: " 'It is fundamental that a marriage contract differs from other contractual relations in that there exists a definite and vital public interest in reference to the marriage relation. . . .' [Citation.]

" 'The laws relating to marriage and divorce [citations] have been enacted because of the profound concern of our organized society for the dignity and

---

[5]Significantly, this is not a case involving a spouse's dealing with a third party nor one that is primarily concerned with stability of titles.

stability of the marriage relationship. This concern relates primarily to the status of the parties as husband and wife. The concern of society as to the property rights of the parties is secondary and incidental to its concern as to their status.' [Citation.]

" 'Marriage is a matter of public concern. The public, through the state, has interest in both its formation and dissolution. . . . The regulation of marriage and divorce is solely within the province of the Legislature except as the same might be restricted by the Constitution.' [Citation.]"

### III. *California Is a Community Property State*

#### A. *Historical Background*

California's status as a community property state dates back to the adoption of the state's first Constitution in 1849, when the constitutional convention opted to perpetuate the community property system of Spain and Mexico in the legal system of the new state. (See Cal. Const., former art. XI, § 14 (1849)[6] ; see also *Packard* v. *Arellanes* (1861) 17 Cal. 525, 537.)

The Spanish civil law established two categories of marital property—community property and separate property—in recognition of the equality between husband and wife, based on the separate identity of each and the contribution each made to the success of the marriage. (See de Funiak & Vaughn, Principles of Community Property (Univ. Ariz. Press ed. 1971) § 11.1, p. 24.) "During the marriage, the traditional community property system regards the husband as manager of the community for the benefit of the marital partnership, and each spouse manages his or her own separate property, with community property being the preferred form of ownership." (Prager, *The Persistence of Separate Property Concepts in California's Community Property System, 1849-1975* (1977) 24 UCLA L.Rev. 1, 6-7, fns. omitted.)

Although California had opted for the community property system, the 1850 Legislature enacted implementing legislation that established a marital property law that comported with classic Spanish community property principles in some respects, but differed in others. (Prager, *The Persistence of Separate Property Concepts in California's Community Property System, 1849-1975, op. cit. supra*, at pp. 25-33.) For example, contrary to traditional concepts, under early California law, the husband was given the right to

---

[6]The constitutional provision primarily, if not exclusively, addressed a married woman's right to separate property. For the current version of the provision, see California Constitution, article I, section 21.

manage and control not only the community property, but also the wife's separate property. (*Op. cit. supra*, at pp. 26-27.)

Likewise when the 1850 Legislature adopted the common law of England as the rule of decision in California courts, the action critically affected the development of California's community property system. (See McGinty, *Common Law and Community Property: Origins of the California System* (1976) 51 State Bar J. 478, 537; presently codified at Civ. Code, § 22.2.) Under English common law, the wife's identity is merged into that of the husband (*Peters* v. *Peters* (1909) 156 Cal. 32, 34 [103 P. 219], overruled on another ground in *Self* v. *Self* (1962) 58 Cal.2d 683, 684 [26 Cal.Rptr. 97, 376 P.2d 65]), whereas under Spanish civil law, the husband and wife enjoy separate legal entities (*Packard* v. *Arellanes, supra*, 17 Cal. at p. 537.)

With this background, it is not surprising that one modern commentator has argued that California was not the true community property jurisdiction it had previously purported to be until 1973, when the Legislature enacted significant amendments to the law that in essence embodied the principle of management of the community property by either spouse, irrespective of which one was responsible for its acquisition. (See generally, Prager, *The Persistence of Separate Property Concepts in California's Community Property System, op. cit. supra*.) Put another way: "Accordingly, the community property system mandated by the state constitution has been modified by statutory enactments of the Legislature and interpreted by courts using common-law concepts that are essentially repugnant to, and inconsistent with, basic community property principles. Nevertheless, the influence of common-law principles on the community property system has gradually declined in California. The common-law view that the husband should bear responsibility for all decisions involving marital property has lost out to the community property view of marriage as a partnership. The enactment of the Family Law Act in 1969 and subsequent amendments to the provisions affecting community property during marriage, as continued in the Family Code, have raised the status of the wife to a position of equal management and control responsibility with her husband." (1 Cal. Family Law Practice and Procedure (2d ed. 1994) § 20.02, p. 20-7, fns. omitted.)

B. *Basic Community Property Principles and Presumptions*

■ A basic rule of a community property system is that all property acquired during marriage is community property unless it comes within a specific exception; the major exceptions to the basic community property rule are those relating to separate property. (See 22 Cal. Law Revision Com. Rep. (1992) pp. 134-135.) Thus, there is a general presumption that property

acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source. (See former Civ. Code, § 5110 [Fam. Code, § 760].[7]) This is a rebuttable presumption affecting the burden of proof; hence it can be overcome by the party contesting community property status. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 611-612 [122 Cal.Rptr. 79, 536 P.2d 479].) Since this general community property presumption is not a title presumption, virtually any credible evidence may be used to overcome it, including tracing the asset to a separate property source, showing an agreement or clear understanding between parties regarding ownership status and presenting evidence the item was acquired as a gift. (Hogoboom & King, Cal. Practice Guide: Family Law 1 (The Rutter Group 1994) § 8.363, p. 8-90.)

The former Family Law Act also contained another community property presumption for the purpose of dividing property on dissolution of marriage or legal separation. Former Civil Code section 4800.1 [Fam. Code, § 2581] provided in pertinent part: "(b) For the purpose of division of property upon dissolution of marriage or legal separation, property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, tenancy by the entirety, or as community property is presumed to be community property. This presumption is a presumption affecting the burden of proof and may be rebutted by either of the following:

"(1) A clear statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property.

"(2) Proof that the parties have made a written agreement that the property is separate property." Thus, former Civil Code section 4800.1 established a presumption that property acquired by parties during marriage in *joint title form* is community property for property division purposes upon dissolution or separation. This "presumption affecting the burden of proof" (former Civ. Code, § 4800.1 [Fam. Code, § 2581]) meant the party contesting community property status bore the burden of producing sufficient rebuttal evidence showing different ownership interests. (See § 606.) The burden of proof for the party contesting community property status is by a preponderance of the evidence. (*In re Marriage of Neal* (1984) 153 Cal.App.3d 117 [200 Cal.Rptr. 341], disapproved on other grounds in *In re Marriage of Buol* (1985) 39 Cal.3d 751, 758, fn. 8 [218 Cal.Rptr. 31, 705 P.2d 354].) Former Civil Code section 4800.1 limited the rebuttal evidence to written evidence, such as a

---

[7]Former Civil Code section 5110 also contained other presumptions relating to property acquired by a wife that are not pertinent to this appeal. (See now Fam. Code, § 803.)

deed, thereby effectively creating a statute of frauds. (Hogoboom & King, Cal. Practice Guide: Family Law 1, *op. cit. supra*, § 8:425 at p. 8-104.) Neither tracing nor oral or implied agreements sufficed to rebut the presumption under former Civil Code section 4800.1. The same holds true under Family Code section 2581.

## C. *Characterization Principles*

■ Characterization of property, for the purpose of community property law, refers to the process of classifying property as separate, community, or quasi-community. Characterization must take place in order to determine the rights and liabilities of the parties with respect to a particular asset or obligation and is an integral part of the division of property on marital dissolution.

■ Generally, factors determinative of whether property is separate or community are the time of the property's acquisition; operation of various presumptions, particularly those concerning the form of title; and whether the spouses have transmuted or converted the property from separate to community or vice versa (see Pt. III. D., *post*).

Perhaps the most basic characterization factor is the time when property is acquired in relation to the parties' marital status. (See *In re Marriage of Buol*, *supra*, 39 Cal.3d at p. 757 [" 'The status of property as community or separate is normally determined at the time of its acquisition.' "].) This is particularly true because of the general presumption that property acquired during marriage by either husband or wife or both while domiciled in California is community property, except as otherwise provided by statute. (Former Civ. Code, § 5110 [Fam. Code, § 760].) This rule can be altered by agreement of the spouses. For example, spouses can indicate their intent with respect to the character of the property initially by specifying the form of title in which it is held, or spouses can later transmute the character of the property as between each other.

Where property status cannot otherwise be proved, characterization is determined by applicable presumptions. One category of presumptions includes those presumptions arising from the form of title, such as the joint title form presumption codified in former Civil Code section 4800.1 (Fam. Code, § 2581), and the general common law presumption in favor of title, codified in section 662. Therefore, absent a contrary statute, and unless ownership interests are otherwise established by sufficient proof, record title is usually determinative of characterization. (*In re Marriage of Lucas* (1980) 27 Cal.3d 808, 813 [166 Cal.Rptr. 853, 614 P.2d 285].)

■ Here, by virtue of the 1987 quitclaim deed, Clarence acquired the residence in his sole title. This of course raised the common law presumption that title to property reflects its actual ownership. (See § 662; *In re Marriage of Lucas, supra,* 27 Cal.3d at p. 813.) Thus, Clarence's acquisition of the residence in sole title during marriage presented a conflict between presumptions: the common law form of title presumption versus the presumption that property acquired during marriage is presumed to be community property.

One text and practice guide on family law speculates, on the basis of modern case law as well as earlier decisions, that *in general* when these two presumptions conflict in a spousal property dispute, the statutory community property presumption will predominate and the property will be characterized as community. (1 Cal. Family Law Practice and Procedure, *op. cit. supra,* § 20.12[2][a] at pp. 20-35 to 20-36.) As authority, the text cites *In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179 [212 Cal.Rptr. 803], where the husband during marriage took sole title to property by virtue of a premarital agreement. This court held that when the premarital agreement lapsed the general community property presumption was reinstated and the presumption "arising from the form of title [was] without force." (*Id.* at pp. 1189-1190.) The text also cites *Waldeck* v. *Hedden* (1928) 89 Cal.App. 485, 490 [265 P. 340] (husband was presumed to have taken property as community property when acquired during marriage with community funds by ordinary grant deed) and *Thomasset* v. *Thomasset* (1953) 122 Cal.App.2d 116, 123 [264 P.2d 626] (property acquired during marriage and taken in husband's name was presumed community), disapproved on another ground in *See* v. *See* (1966) 64 Cal.2d 778, 786 [51 Cal.Rptr. 888, 415 P.2d 776].

This case is somewhat distinguishable from the cases cited above because here the property acquisition involved a conveyance *between* the spouses by quitclaim deed. To that extent, we are dealing with a situation similar to that involved in *In re Marriage of Broderick* (1989) 209 Cal.App.3d 489 [257 Cal.Rptr. 397], where the Court of Appeal reached a different result than ours. In *Broderick,* the Court of Appeal held that where community property interests are conveyed between spouses by quitclaim deed, title is presumptively held as shown in the deed. (*Id.* at pp. 496-497.) *Broderick,* however, is not controlling here, for Mrs. Broderick's attempt to set aside the quitclaim deed on the basis of duress was not supported by substantial evidence; indeed the case does not even address the issue of the evidentiary standard. (*Id.* at p. 499.) Here, the trial court found Judy proved by a preponderance of the evidence her claim of duress and other contract defenses to the deed; she lost because she did not prove them by clear and convincing evidence.

### D. *Transmutation Rules*

██ ██ The manner in which Clarence acquired the residence in 1987 also is significant because it was a transmutation—an interspousal transaction or agreement which works a change in the character of the property—and special rules govern transmutations. (See generally, Fam. Code, § 850 et seq.)

The validity of a transmutation is dependent on a number of factors. Among these are (1) transmutations made on or after January 1, 1985,[8] must be in writing and contain an "express declaration" by the spouse whose interest in the property is adversely affected (former Civ. Code, § 5110.730, subd. (a) [Fam. Code, § 852, subd. (a)]); see also *Estate of MacDonald* (1990) 51 Cal.3d 262, 272-273 [272 Cal.Rptr. 153, 794 P.2d 911]) and (2) spouses are subject to special standards of disclosure towards each other with respect to property, based on their confidential and fiduciary relationship (former Civ. Code, §§ 5103, 5125 [Fam. Code, §§ 721, 1100]).

██ Statutorily, spouses have the right to enter into transactions with each other as well as other persons. (Former Civ. Code, § 5103, subd. (a) [Fam. Code, § 721, subd. (a)].) However, that same statute also states that interspousal transactions must comport with the rules controlling the actions of persons occupying confidential relations with each other. (Former Civ. Code, § 5103, subd. (b) [Fam. Code, § 721, subd. (b)].) Thus, the competence of spouses to engage in transactions with each other is subject to the circumstances being pleasing to the fiduciary standard. (*Locke Paddon* v. *Locke Paddon* (1924) 194 Cal. 73, 80 [227 P. 715]; see also Recommendation Relating to Marital Property Presumptions and Transmutations (Sept. 1983) 17 Cal. Law Revision Com. Rep. (1984), 205, 224 [Spouses who transmute property "are subject to . . . the special rules that control the actions of persons occupying confidential relations with each other. See [Civil Code] Section 5103."].)

When an interspousal transaction advantages one spouse, "[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence." (*Brison* v. *Brison* (1888) 75 Cal. 525, 529 [17 P. 689].) "Courts of equity . . . view gifts and contracts which are made or

---

[8]Transmutations of property made before January 1, 1985, are still governed by the law that existed before that date. (See Fam. Code, § 852, subd. (e).) Under the former law, a transmutation could be made by written or oral agreement. No particular formalities were required for an effective transmutation except that the agreement be fair and based on full disclosure of relevant facts. (*Estate of Wilson* (1976) 64 Cal.App.3d 786, 798 [134 Cal.Rptr. 749].) The mutual consent of the spouses constituted sufficient consideration to support the transmutation. (*Ibid.*)

take place between parties occupying confidential relations with a jealous eye." (*Payne* v. *Payne* (1909) 12 Cal.App. 251, 254 [107 P. 148] [setting aside of deed from enfeebled, elderly woman to daughter-in-law upheld on grounds of undue influence even though no proof of fraud or deceit].)

Because transmutations must conform to the legal standard codified in former Civil Code section 5103, subdivision (b) (Fam. Code, § 721, subd. (b)), where the transmutation is evidenced by a deed as is the case here, the presumption of undue influence arising from advantage necessarily conflicts with the common law presumption of title, codified in section 662.

## IV. *Conflicting Presumptions*

### A. *Section 662—Promoting Stability of Title*

Section 662 provides: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."

The Comment of the Law Revision Commission states: "Section 662 codifies a common law presumption recognized in the California cases. The presumption may be overcome only by clear and convincing proof. [Citing *Olson* v. *Olson* (1935) 4 Cal.2d 434, 437 (49 P.2d 827); *Rench* v. *McMullen* (1947) 82 Cal.App.2d 872 (187 P.2d 111).]" (7 Cal. Law Revision Com. Rep. (1965) pp. 111-112.) ■ The presumption is based on promoting the public "policy . . . in favor of the stability of titles to property." (See § 605.) "Allegations . . . that legal title does not represent beneficial ownership have . . . been historically disfavored because society and the courts have a reluctance to tamper with duly executed instruments and documents of legal title." (*Weiner* v. *Fleischman* (1991) 54 Cal.3d 476, 489 [286 Cal.Rptr. 40, 816 P.2d 892].)[9]

Section 662 is concerned primarily with the stability of titles, which obviously is an important legal concept that protects parties to a real property transaction, as well as creditors. Here, however, our focus is on characterization of marital property as effected by a transmutation by quitclaim deed. The issue is how property should be divided between spouses

[9]We note there is only a limited range of issues for which a party is held to the high evidentiary standard of clear and convincing evidence. (2 Strong, McCormick on Evidence (4th ed. 1992) § 340, p. 441; see also 1 Witkin, Cal. Evidence (3d ed. 1986) § 161, pp. 138-139.) Included in this limited range are claims to change the ostensible character of a duly executed deed that purports to convey property. (See *Sheehan* v. *Sullivan* (1899) 126 Cal. 189, 193 [58 P. 543] [citing " 'the security of titles and sound public policy' " as among the reasons for the high evidentiary standard]; *Spaulding* v. *Jones* (1953) 117 Cal.App.2d 541, 545 [256 P.2d 637].)

upon dissolution. This case does not involve third parties nor does it place at risk the rights of a creditor. In any event, we note the law regarding transmutations makes reference to third party rights and affords protections against fraud in transmutations as follows: (1) a transmutation is subject to the laws governing fraudulent transfers (former Civ. Code, § 5110.720 [Fam. Code, § 851]); and (2) a transmutation of real property is not effective with respect to third parties that do not have notice of the transmutation unless it is recorded (former Civ. Code, § 5110.730, subd. (b) [Fam. Code, § 852, subd. (b)]). Thus, concerns of stability of title are lessened in characterization problems arising from transmutations that do not involve third parties or the rights of creditors.

## B. *Former Civil Code Section 5103—Mutual Accountability for Spouses*

 At the time of trial, former Civil Code section 5103, subdivision (b), provided in pertinent part that "in transactions between themselves, a husband and wife are subject to the general rules which control the actions of persons occupying confidential relations with each other."[10] As clarified by later legislation (see fn. 10, *ante*), "[t]his confidential spousal relationship imposes a duty of the highest good faith and fair dealing on each spouse, and

---

[10]The original version of former Civil Code section 5103 was contained in Civil Code section 158, which was enacted in 1872. Civil Code section 158 was repealed in 1969 and replaced by Civil Code section 5103. (Stats. 1969, ch. 1608, § 3, p. 3313 & § 8, p. 3338.) Civil Code section 5103 was amended in 1984 (Stats. 1984, ch. 892, § 2, p. 2986), in 1986 (Stats. 1986, ch. 820, § 13, p. 2735) and in 1991 (Stats. 1991, ch. 1026, § 2) before it was repealed in 1992 and replaced with Family Code section 721, effective January 1, 1994 (Stats. 1992, ch. 162, § 10, operative Jan. 1, 1994).

The version of former Civil Code section 5103, subdivision (b), in effect at the time of trial read as follows: "(b) Except as provided in Sections 143, 144, and 146 of the Probate Code, in transactions between themselves, a husband and wife are subject to the general rules which control the actions of persons occupying confidential relations with each other." (Stats. 1986, ch. 820, § 13, p. 2735.)

As a result of the 1991 amendment, subdivision (b) of former Civil Code section 5103 read as follows: "(b) Except as provided in Sections 143, 144, 146, and 16040 of the Probate Code, in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 15019, 15020, 15021, and 15022 of the Corporations Code, including the following: . . . ." (Stats. 1991, ch. 1026, § 3.)

In an uncodified section of the 1991 legislation, the Legislature expressed the following intent: "The Legislature finds and declares that it is the public policy of this state that marriage is an equal partnership and that spouses occupy a confidential and fiduciary relationship with each other, whereby each spouse places trust and confidence in the integrity, honesty and fairness of the other spouse. Therefore by this act, the Legislature intends to *clarify* the management standards controlling Sections 5103 and 5125 of the Civil Code." (Stats. 1991, ch. 1026, § 1, italics added.)

neither shall take any unfair advantage of the other." (See now Fam. Code, § 721, subd. (b).)

In *Estate of Cover, supra*, 188 Cal. at pages 143 to 144, the Supreme Court observed: "It is the rule in this state that transactions between husband and wife shall be subjected to the general rule which controls the actions of persons occupying confidential relations with each other, . . . which, when applied to the relation of husband and wife, has been interpreted to mean that 'in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption.' [Citations.]"

In *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 88 [260 Cal.Rptr. 403], the Court of Appeal observed: "The marriage relationship alone will not support a presumption of undue influence by one spouse over the other where the transaction between them is shown to be fair. But, where one spouse admittedly secures an advantage over the other, the confidential relationship will bring into operation a presumption of the use and abuse of that relationship by the spouse obtaining the advantage."

Here, where Judy transferred her interest in real property to Clarence for his cosignature on an automobile loan—clearly inadequate consideration for execution of the quitclaim deed—Clarence properly should have borne the burden of rebutting the presumption of undue influence before the 1987 quitclaim deed can be confirmed. (*Estate of Cover, supra*, 188 Cal. at p. 143; *Barney v. Fye* (1957) 156 Cal.App.2d 103, 107 [319 P.2d 29].) To demonstrate the advantage was not gained in violation of the confidential relation between marital partners, Clarence's burden properly should have been to prove the quitclaim deed "was freely and voluntarily made, and with a full knowledge of all the facts, and with a complete understanding of the effect of the transfer." (*Brown v. Canadian Indus. Alcohol Co.* (1930) 209 Cal. 596, 598 [289 P. 613]; *In re Marriage of Baltins, supra*, 212 Cal.App.3d at p. 88.)

The concerns of former Civil Code section 5103 (Fam. Code, § 721) are with relational issues such as unfairness and advantage. In a sense, the statute is one of mutual accountability, requiring each spouse to show his or her conduct in connection with an interspousal transaction conformed to the legal standard codified in former Civil Code section 5103, subdivision (b) (Fam. Code, § 721, subd. (b)).

C. *The Conflict Between Presumptions in This Case*

We are dealing here with two rebuttable presumptions that under the facts of this case are in irreconcilable conflict. "A presumption is an

assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action." (§ 600, subd. (a).) The trier of fact is required to assume the existence of the presumed fact "unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (§ 604.)

Section 662 establishes a rebuttable presumption in favor of title. As applied here, it placed the burden on Judy to prove by clear and convincing evidence[11] that her contract defenses (see Civ. Code, § 1567) are valid and the 1987 quitclaim deed should be set aside.

Under former Civil Code section 5103, subdivision (b), and related case law governing the duties of trustees,[12] a rebuttable presumption of undue influence arises when one spouse obtains an advantage over another in a community property transaction. Had the presumption been applied here, it would have placed the burden on Clarence to show the 1987 quitclaim transaction was *not* consummated in violation of his fiduciary duties. The presumption that the advantage was gained by the exercise of undue influence continues until it is dispelled. (*Matassa* v. *Matassa* (1948) 87 Cal.App.2d 206, 215 [196 P.2d 599].) The burden of dispelling the presumption rests on the spouse advantaged by the transaction. (*Estate of Cover*, *supra*, 188 Cal. at p. 143.)

Here, the outcome of the case was determined by the party who had the initial burden of producing evidence. Since the trial court applied section 662, Judy was given the initial burden to rebut the presumption of title. She lost because she did not meet the clear and convincing burden of proof standard, although she met the lesser evidentiary standard of preponderance of the evidence in her attempts to show the deed was procured through duress, constructive fraud, breach of fiduciary duty and other contract defenses. However, if Clarence had been given the initial burden to rebut the presumption that he gained an advantage in violation of the confidential relationship, he could not have met his burden of producing evidence—given the trial court's factual findings that Judy had established the contract defenses by a preponderance of evidence.[13] Hence, there would have been a different result had the presumption of former Civil Code section 5103 been applied.

---

[11]In addition to being a presumption affecting the burden of producing evidence, section 662 is a presumption affecting the burden of proof. (§§ 601, 606.)

[12]See, e.g., *Rader* v. *Thrasher* (1962) 57 Cal.2d 244 [18 Cal.Rptr. 736, 368 P.2d 360].

[13]We have reviewed Clarence's argument that the record is not clear that the trial court found Judy had proven undue influence and her related claims by a preponderance of the evidence. We reject this argument. The trial court stated on the record that if "the test were a

Because the trial court applied section 662, Clarence won; relational issues such as unfairness and advantage were not considered as they would have been under former Civil Code section 5103.

## V. *Application of Section 662 in Confidential Relations Cases*

Here, the trial court expressly followed the mandate of section 662, finding no reason why the statute should not apply to a family law proceeding. At the time of the trial, there were no published cases on whether section 662 applied to family law disputes.[14]

However, there were analogous published cases dealing with the application of the statute to cases involving parties sharing a confidential relationship. (See *Tannehill* v. *Finch* (1986) 188 Cal.App.3d 224 [232 Cal.Rptr. 749] (*Tannehill*); *Toney* v. *Nolder* (1985) 173 Cal.App.3d 791 [219 Cal.Rptr. 497] (*Toney*).) Here, the trial court stated it was relying on *Toney, supra,* 173 Cal.App.3d 791. In *Toney,* the Court of Appeal held section 662 properly applied to an alleged oral partnership agreement for the purchase of certain property; the fact the parties shared a confidential relationship created no exception to the statute's mandatory language. (173 Cal.App.3d at pp. 794-796.)

*Toney* also was relied upon in *Tannehill, supra,* 188 Cal.App.3d 224, where the Court of Appeal held section 662 should apply to a property dispute involving a man and woman who had lived together for six years. (See *Marvin* v. *Marvin, supra,* 18 Cal.3d 660.) During this period, the man had acquired title to property in his own name; the woman claimed an interest in the property and had sued for breach of contract under *Marvin* when the man refused to divide the property with her. Relying on the *Toney* holding that there is no confidential relationship exception to section 662, the *Tannehill* court stated: "There is no significant difference between *Toney* and the case now before us: Plaintiff in *Toney* sought to establish a 50 percent interest in the property pursuant to an oral partnership agreement; Tannehill sought to establish a 50 percent interest in the property based on an implied *Marvin* agreement. In both actions, plaintiffs sought to establish a contractual agreement which, if proven, would rebut the presumption that the defendants, as owners of legal title, were also the full beneficial owners." (*Tannehill, supra,* 188 Cal.App.3d at p. 228.)

---

preponderance of the evidence, . . . that burden had been carried by Mrs. Haines." The trial court's comments in this regard resolve any confusion on the issue.

[14]With the publication of *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478 [273 Cal.Rptr. 696], in which the Court of Appeal (Second Dist., Div. Three) held section 662 applies to marital actions, there no longer is a vaccum of legal authority on this issue. We shall discuss *Weaver* in part VI., *post*.

However, what the plaintiffs in *Toney* and *Tannehill* "sought to establish" (188 Cal.App.3d at p. 228) would have been presumed as a matter of law under principles of community property if the plaintiffs and defendants in those cases had been married. All property acquired by a married person during marriage is presumed to be community property. (See former Civ. Code, § 5110 [Fam. Code, § 760].)

Moreover, where between unmarried persons, the party claiming a confidential relation exists has the burden of proving it (*Buchmayer* v. *Buchmayer* (1945) 68 Cal.App.2d 462, 467 [157 P.2d 9]), under former Civil Code section 5103, subdivision (b) (Fam. Code, § 721, subd. (b)), marital partners are parties to a confidential relation as a matter of law. Further, while marriage includes a confidential relationship, it encompasses much more. The trial court in essence equated Judy's and Clarence's relationship to that of the unmarried disputants in *Toney* who shared a confidential relationship based on their partnership status. In so relying on *Toney* to apply section 662, the trial court ignored the unique status of marriage and the unique nature of the marriage contract.

## VI. *Is "In re Marriage of Weaver" Controlling Here?*

As pointed out in footnote 14, *ante*, there is now direct legal authority for application of section 662 in marital proceedings. (See *In re Marriage of Weaver*, *supra*, 224 Cal.App.3d 478.) The question for us is whether it is controlling authority here.

In *Weaver*, the parties lived in a house that the wife and her parents had acquired in joint tenancy before she married. When her parents died during the marriage, the wife, as the surviving joint tenant, became the sole legal and record owner of the property. Subsequently, the wife and husband borrowed $12,000 secured by a trust deed on the house. They both signed the note and the trust deed. At all times title rested solely in the wife's name. The husband contended the wife had transmuted her separate property interest to community property. By a preponderance of the evidence, the trial court found there had been an oral transmutation. The wife appealed, contending the presumption of section 662 applied and required the court to find clear and convincing evidence to rebut the title presumption in her favor. The husband argued section 662 had no application in marital disputes. The Court of Appeal disagreed with the husband, holding: "In a case such as this, where one spouse has acquired legal title to a parcel of real property under circumstances which make such acquisition separate property, we see no reason not to apply the higher evidentiary standard set out in Evidence Code section 662. There is nothing in that statutory mandate which

excludes marital actions from those cases involving a claimed dichotomy between the legal and beneficial interests to property." (*In re Marriage of Weaver, supra*, 224 Cal.App.3d at pp. 486-487, fn. omitted.)

Relying on *Tannehill, supra*, 188 Cal.App.3d 224, and *Toney, supra*, 173 Cal.App.3d 791, which approved the use of section 662 in nonmarital cases involving a confidential relationship, the *Weaver* court noted the parties in those cases "shared a confidential relationship, not unlike that shared by marital partners. (See Civ. Code, § 5103, subd. (b).)" (*In re Marriage of Weaver, supra*, 224 Cal.App.3d at p. 486, fn. omitted.) The *Weaver* court also noted there is nothing in the language of section 662 excluding "marital actions from those cases involving a claimed dichotomy between the legal and beneficial interests to property." (224 Cal.App.3d at pp. 486-487.)

While we have no quarrel with the result in *Weaver*, we do not agree with the implied holding that section 662 is applicable to marital proceedings regardless of any conflict with former Civil Code section 5103, subdivision (b) [Fam. Code, § 721, subd. (b)]. To that extent, we decline to follow *Weaver*, as we shall explain below.

First, we note *Weaver* is distinguishable. The *Weaver* court used section 662 to protect the original character of the property from change rather than defend the character of the property after change. Also, the *Weaver* court did not rely on both sentences of section 662, but rather only the second sentence concerning the elevated standard of proof. The *Weaver* court did not use the rebuttable presumption contained in section 662 to establish the wife's property was her separate property, but rather ruled it was her separate property because she owned it before marriage. (See former Civ. Code, § 5107 [Fam. Code, § 770, subd. (a)(1)].) The *Weaver* court ruled the husband's alleged oral agreement transmuting wife's separate property to community property should be tested by the clear and convincing standard of proof of section 662. In so doing, it placed the higher burden of proof on the marital party that sought to gain an advantage.

Second, we do not believe that the *Weaver* court thoroughly explored the ramifications of former Civil Code section 5103, subdivision (b)—perhaps because that case did not involve the overbearing allegations of undue influence, duress and constructive fraud present here. In effect, on the basis of the holdings in *Toney* and *Tannenhill* that section 662 applies to confidential relationships, the *Weaver* court held section 662 should apply to marital actions because former Civil Code section 5103, subdivision (b), provided at the time: " 'in transactions between themselves, a husband and wife are subject to the general rules which control the actions of persons

occupying confidential relations with each other.' " (*In re Marriage of Weaver, supra,* 224 Cal.App.3d at p. 486, fn. 6.) However, as we have emphasized above, the marital relation is much more than a confidential relation between two unmarried partners.

## VII. *Conclusion*

Where one spouse has taken advantage of another in an interspousal transaction, a presumption of undue influence arises under former Civil Code section 5103, subdivision (b) (Fam. Code, § 721, subd. (b)). However, this presumption, which the law provides to protect married persons, cannot come into play if section 662 is applied because of the higher evidentiary standard of section 662. Therefore, application of section 662 in such situations can significantly weaken protections the Legislature intended to provide for spouses who are taken advantage of in interspousal transactions. This cannot be in keeping with the intent of the Legislature, which conditioned the power of spouses to transact with each other on their compliance with the fiduciary standard. (See former Civ. Code, § 5103, [Fam. Code, § 721].) As amicus curiae points out, "[w]henever an interspousal transaction is challenged, it should be analyzed under the same statute which gives spouses the conditional authority to transact with each other . . . ." (See former Civ. Code, § 5103 [Fam. Code, § 721.]) Application of section 662 would preclude this; in effect, it would abrogate the protections afforded to married persons under former Civil Code section 5103, subdivision (b) (Fam. Code, § 721, subd. (b)).

Finally, we note that where two presumptions are in conflict, the more specific presumption will control over the more general one. (See *Rader* v. *Thrasher, supra,* 57 Cal.2d at p. 252.) In *McKay* v. *McKay* (1921) 184 Cal. 742, 746-747 [195 P. 385], the Supreme Court held the specific presumption that any advantage obtained by a husband from a wife was without consideration and under undue influence "must, in the absence of any rebutting evidence, prevail over" the more general presumption that money paid by one to another was due to the latter. Aside from the prevailing presumption being "the less general of the two," the Supreme Court noted that the undue influence presumption should also prevail because ". . . the very reason for the existence of this particular presumption is to afford relief in just such contingencies as the present, namely, when there has been a transfer of money from the wife to the husband. The result is that the fact of the relationship of the parties creates a presumption of lack of consideration and undue influence which, until it is overcome by other evidence, is paramount to the general presumption, which would arise under ordinary circumstances upon mere proof of payment, to the effect that money is due to the person to whom it is paid." (184 Cal. at p. 747.)

We conclude that application of section 662 is improper when it is in conflict with the presumption of undue influence that emanates from former section 5103, subdivision (b) (Fam. Code, § 721, subd. (b)). Any other result would abrogate the protections afforded to married persons and denigrate the public policy of the state that seeks to promote and protect the vital institution of marriage. Because Judy successfully proved a number of her defenses to the 1987 quitclaim deed by a preponderance of the evidence, the deed should have been set aside. In light of this conclusion, it is unnecessary for us to address the other arguments raised by the parties and amicus curiae.

## DISPOSITION

The portion of the judgment awarding Clarence reimbursement under former Civil Code section 4800.2 is reversed. The trial court is ordered to amend the judgment to reflect the setting aside of the quitclaim deed and the proper allocation to the parties of the Teebird Lane residence as community property in accordance with the views expressed above.

Froehlich, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied April 6, 1995.