T.C. Memo. 2010-178

UNITED STATES TAX COURT

MARK RANUIO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4185-08L.                    Filed August 9, 2010.

<u>Steven A. Malcoun</u>, for petitioner.

<u>Jeremy L. McPherson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Pursuant to section 6330(d),[1] petitioner seeks review of respondent's determination to sustain a levy to collect petitioner's unpaid 2005 Federal income tax liability.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference. Petitioner resided in California when he filed his petition.

Petitioner filed his 2005 Form 1040, U.S. Individual Income Tax Return, on October 16, 2006.[2] On the 2005 return petitioner claimed a filing status of "Married filing separately" and reported total tax due of $316,055. Petitioner made no estimated tax payments for 2005, had no Federal income tax withheld in 2005, and did not include payment with the 2005 return.

On March 19, 2007, respondent sent a Final Notice, Notice of Intent to Levy and Notice of Your Right to a Hearing (NIL), to petitioner with respect to petitioner's 2005 Federal income tax liability. On March 23, 2007, respondent received from petitioner a Form 12153, Request for a Collection Due Process or Equivalent Hearing, with respect to petitioner's 2005 liability. Petitioner stated on the Form 12153 that he wished to submit an offer-in-compromise (OIC) with respect to his 2005 Federal income tax liability and was requesting a hearing because: "I am not employed and have no job or business. The tax liability arose from a forced liquidation of a prior business." Petitioner's request for a collection due process hearing was assigned to

---

[2]It is not clear from the record whether petitioner's 2005 Form 1040 was timely filed.

Kimberly A. Martin (Ms. Martin), a settlement officer in respondent's Office of Appeals.

On April 3, 2007, respondent recorded a notice of Federal tax lien with respect to petitioner's 2005 Federal income tax liability with the county recorder in San Joaquin County in Stockton, California. Also on April 3, 2007, respondent mailed to petitioner a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (NFTL) with respect to petitioner's 2005 tax liability. There is no evidence in the record that petitioner ever requested a hearing with respect to the NFTL, and the NFTL is not at issue in this proceeding.

On September 20, 2007, Ms. Martin sent a letter to petitioner's counsel, Steven A. Malcoun (Mr. Malcoun), in which she acknowledged receipt of petitioner's Form 12153. Ms. Martin noted that petitioner had not made estimated tax payments for 2006 or 2007, and she advised petitioner that she could not consider an OIC with respect to 2005 unless he was in compliance with his tax obligations for 2006 and 2007.

On September 28, 2007, petitioner mailed to the Appeals Office an OIC with related documents offering to pay $25,000, payable within 15 months of respondent's acceptance of the OIC, in compromise of his 2005 liability. Petitioner's OIC package consisted of a Form 656, Offer in Compromise, a Form 433-A, Collection Information Statement for Wage Earners and Self-

Employed Individuals, a cashier's check for $5,150,[3] and an

accountant's report and statement of financial condition.  The

accountant's report and statement of financial condition was

prepared by Kemper C.P.A. Group, LLP, and included the following

disclaimer:

> [Petitioner] has elected to omit substantially all of
> the disclosures required by generally accepted
> accounting principles.  If the omitted disclosures were
> included in the statement of financial condition, they
> might influence the user's conclusions about the
> financial condition of * * * [petitioner].

Petitioner checked the box on Form 656 indicating the OIC

was justified by reason of doubt as to collectibility.  An

attachment to Form 656 explained that petitioner had been in the

trucking business but was forced to shut down his business in

2004 after his largest customer did not renew petitioner's

contract.  As a result, petitioner was forced to sell all

corporate assets to pay off corporate debts.  Further, because

some of the corporate debts were secured by his personal

guaranty, petitioner was required to sell some of his real estate

holdings to satisfy the debts.  The Form 433-A indicated

petitioner was unemployed, had no source of income, had less than

---

[3]Petitioner's $5,150 payment consisted of a 20-percent
downpayment on petitioner's $25,000 OIC and a $150 application
fee.  See sec. 7122(c).

$12,000 in gross assets,[4] and had monthly expenses of $800. On October 10, 2007, respondent's Appeals Office sent a letter to Mr. Malcoun acknowledging receipt of petitioner's OIC package and informing petitioner that the OIC met the Appeals Office's standards for processing.

On October 11, 2007, Mr. Malcoun mailed a copy of petitioner's 2006 return to Ms. Martin.[5] Petitioner made no estimated tax payments for 2006 and had no Federal income tax withheld in 2006. On the 2006 return petitioner reported total tax due of $163,420 and a penalty under section 6654 of $7,733 for failure to pay estimated tax. Petitioner's 2006 Federal income tax liability is not at issue. See infra p. 17.

On October 17, 2007, Ms. Martin sent a letter to Mr. Malcoun acknowledging receipt of petitioner's 2006 Federal income tax return. Ms. Martin noted that petitioner was not in compliance with his current Federal income tax obligations because he had an unpaid liability for 2006. She also noted that the financial disclosures petitioner submitted with his OIC were incomplete because they did not include information about his wife, Paulette

---

[4]Petitioner reported on the Form 433-A that he had the following assets: $195 in a bank account, $900 in cash, $10,000 worth of jewelry, and $500 worth of clothing.

[5]It is not clear whether petitioner had already filed his 2006 return when he mailed a copy to Ms. Martin, nor is it clear whether petitioner's 2006 return was timely filed.

Ranuio (Mrs. Ranuio).[6]  Consequently, Ms. Martin explained she could not consider petitioner's OIC.  On October 18, 2007, Mr. Malcoun responded that Mrs. Ranuio's assets and income were not relevant because petitioner's filing status was married filing separately.

On October 22, 2007, Ms. Martin sent a letter to Mr. Malcoun explaining that Mrs. Ranuio's income and assets were relevant because petitioner resided in a community property State, Mrs. Ranuio held title to the couple's residence, and Mrs. Ranuio worked for petitioner's company.[7]  Ms. Martin informed petitioner that if he wished to proceed with consideration of his OIC, he would have to submit the following documents and information by November 5, 2007:

• An amended Form 656 including petitioner's 2006 liabilities;

• a new Form 433-A including Mrs. Ranuio's assets and income;

• an accounting of all funds petitioner received from sales of real estate and business property;

• bank statements from all accounts--including accounts in Mrs. Ranuio's name--from February 1, 2005, through October 22, 2007;

---

[6]Mrs. Ranuio was the settlor of the Chanel 2007 Irrevocable Trust dated Jan. 30, 2007.

[7]It is not clear how Ms. Martin concluded that Mrs. Ranuio worked for petitioner's company.  The record reflects that petitioner and Mrs. Ranuio were partners in at least three business partnerships in 2005 and 2006.

- copies of all transfer deeds and deeds of trust for petitioner and Mrs. Ranuio's residence,[8] as well as evidence that petitioner and Mrs. Ranuio had paid the mortgage, homeowner's insurance premiums, and property taxes;

- a copy of the purchase agreement for petitioner and Mrs. Ranuio's residence, as well as a copy of the mortgage for the residence showing the current balance and the source of any downpayment;

- copies of all canceled checks from all of petitioner's and Mrs. Ranuio's accounts, including accounts in Mrs. Ranuio's name or jointly held with Mrs. Ranuio, for the past 6 months;

- copies of all brokerage and retirement account statements, including those in Mrs. Ranuio's name, for the past 12 months;

- copies of any trust documents in which petitioner was the beneficiary or in which petitioner had an interest;

- copies of all registration records, purchase agreements, and loan statements for all vehicles petitioner or Mrs. Ranuio owned or operated;

---

[8]Residence refers to the home in which petitioner and Mrs. Ranuio live and to which Mrs. Ranuio apparently holds title.

- an accounting of the disposition of any trucks or trailers sold in the dissolution of petitioner's business interests from 2005 through 2007;

- copies of Forms 1065, U.S. Return of Partnership Income, for Vito Transfer, LLC, Ultra Express Truck Wash, LLC, and Two Vee Partners for 2005 and 2006; and

- a statement of how petitioner and Mrs. Ranuio were meeting their basic living expenses and, if petitioner or Mrs. Ranuio had taxable income in 2007, evidence of sufficient withholding or estimated tax payments.

Ms. Martin closed her letter by repeating that if petitioner did not submit the requested documents by November 5, 2007, she would have no choice but to terminate petitioner's hearing and reject his offer.

On October 26, 2007, Mr. Malcoun agreed to amend petitioner's Form 656 to include 2006. Mr. Malcoun also agreed to provide documents relating to whether the assets that generated petitioner's taxable income in 2005 and 2006 were community property or separate property under California law. Mr. Malcoun maintained, however, that any assets determined to be Mrs. Ranuio's separate property were not relevant to respondent's decision whether to accept or reject petitioner's OIC. On November 5, 2007, Ms. Martin sent a letter to Mr. Malcoun stating, in relevant part:

I do not intend to try and collect from the separate property of a non-liable spouse however you will need to provide evidence to support your claim of separate property. I will need to investigate how the property was characterized at the time of acquisition and if the character of the property has been changed or transmuted into community property.

Ms. Martin asked petitioner to provide all the documents requested in her October 22, 2007, letter no later than November 12, 2007. On November 6, 2007, Mr. Malcoun asked for an additional week; i.e., until November 19, 2007, to provide the documents. Ms. Martin granted the extension.

On November 19, 2007, Mr. Malcoun sent a letter to Ms. Martin that included nearly 200 pages of real estate, business, and personal records. Specifically, Mr. Malcoun's correspondence included: (1) A chain of title guaranty with respect to real property petitioner owned in Modesto, California (Modesto real property); (2) petitioner and Mrs. Ranuio's marriage license; (3) various grant deeds and deeds of trust relating to the Modesto real property; (4) a partnership agreement showing that petitioner and Mrs. Ranuio formed a California partnership known as Two Vee Partners and that each partner's interest in Two Vee Partners was his or her separate property; and (5) Two Vee Partners' 2005 Form 1065. The records show that petitioner transferred the Modesto real property to Two Vee Partners on February 3, 2005, and Two Vee Partners sold the property the same day for $2,425,000. Two Vee Partners allocated 100 percent of

the Modesto real property's built-in gain to petitioner and issued a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for 2005 that reported a distribution to petitioner of $1,109,617.[9]

Mr. Malcoun added that he was still putting together an accounting regarding petitioner's sales of real estate and equipment used in his business and was gathering information with respect to petitioner and Mrs. Ranuio's residence and other real property in Charter Way and Fresno, California.  Mr. Malcoun stated that all canceled checks, trust documents, and vehicle information Ms. Martin requested would be included in the accounting.  Mr. Malcoun's November 19, 2007, correspondence also included an amended OIC with respect to 2005 and 2006, offering to settle petitioner's 2005 liability for $25,000 and petitioner's 2006 liability for $10,000, and a cashier's check for $2,150.

On November 20, 2007, Mr. Malcoun mailed to Ms. Martin copies of the 2005 and 2006 Forms 1065 for Vito Transfer, LLC, and Ultra Express Truck Wash, LLC.  The Forms 1065 show that petitioner and Mrs. Ranuio were each 50-percent partners in Vito Transfer, LLC, and Ultra Express Truck Wash, LLC.  Vito Transfer, LLC, issued to petitioner a Schedule K-1 for 2005 that showed

---

[9]The character of the distributed property is not clear, and petitioner has supplied no further information about the distribution.

petitioner received withdrawals and distributions totaling $42,778.[10]  Ultra Express Truck Wash, LLC, issued to petitioner a Schedule K-1 for 2005 that showed no withdrawals by or distributions to petitioner.

On November 28, 2007, Ms. Martin informed Mr. Malcoun that she had processed petitioner's Form 656 for 2006.  She noted, however, that petitioner still had not provided most of the information she requested in her October 22, 2007, correspondence.  With respect to petitioner's real property sales, Ms. Martin wrote:

> The closing statements from the sale of the 5 properties show cash to the taxpayer in the amounts of $250,087.51, $219,418.75, $340.59, $111,007.54 and $70,399.47 * * *.  These amounts exceed the amount of the tax liability and normally would be considered a dissipated asset for purposes of evaluating the offer. If this is the case then the offer would not be acceptable.

Ms. Martin attached the closing statements to her correspondence[11] and asked petitioner to provide an accounting of the disposition of funds he received from the sales of all real estate and business property.  Ms. Martin stated she would reject petitioner's OIC unless he provided the remainder of the requested information by December 10, 2007.

---

[10]The character of the distributed property is not clear.

[11]It is not clear how Ms. Martin obtained copies of the closing statements.  Petitioner does not dispute the authenticity or accuracy of the closing statements.

On December 4, 2007, Mr. Malcoun informed Ms. Martin that he was still attempting to obtain the requested information from banks and title companies. Mr. Malcoun explained that he had planned to assemble the information shortly after Thanksgiving but was out of the office from November 25 through December 2 attending to his daughter, who was hospitalized with an emergency medical condition. Mr. Malcoun enclosed copies of (1) transfer deeds and deeds of trust relating to petitioner and Mrs. Ranuio's residence; (2) deeds relating to the sale of a 2-acre property; (3) a trust in which petitioner was a contingent beneficiary; (4) records relating to petitioner's sales of equipment and his use of the sale proceeds; (5) copies of the first and second mortgage agreements for petitioner and Mrs. Ranuio's residence; (6) copies of all canceled checks for August, September, and October 2007 for the first mortgage on petitioner and Mrs. Ranuio's residence; and (7) copies of petitioner's vehicle registration. Mr. Malcoun acknowledged he had yet to provide (1) a complete accounting of the proceeds petitioner received from sales of real estate and business assets, (2) bank statements for petitioner and Mrs. Ranuio from February 1, 2005, through the present, (3) evidence of homeowner's insurance, (4) canceled checks from petitioner's and Mrs. Ranuio's accounts for the preceding 6 months, (5) copies of petitioner's and Mrs. Ranuio's brokerage and retirement account statements, (6) a statement of how petitioner was meeting

his living expenses, as well as a statement that petitioner and Mrs. Ranuio were in compliance with their 2007 tax obligations, and (7) a new Form 433-A. Mr. Malcoun wrote that he expected to provide the missing information by December 10, 2007, provided he received cooperation from third parties and his daughter's illness did not require further absences from his office. Mr. Malcoun did not explain why petitioner could not provide at least some, if not all, of the missing information using information presumably in his possession, custody, and control, including his personal knowledge.

The documents Mr. Malcoun provided regarding petitioner and Mrs. Ranuio's residence appear to show the following: Petitioner acquired the residence as his sole and separate property on or about August 12, 1993; petitioner conveyed his interest in the residence to himself and Mrs. Ranuio, as husband and wife, on or about August 30, 1993; and petitioner and Mrs. Ranuio conveyed their interest in the residence to Mrs. Ranuio, as her sole and separate property, on January 18, 2005. The record does not explain the reasons for the property transfers. Mr. Malcoun informed Ms. Martin that he could not find a copy of the purchase agreement for the residence but that the document was irrelevant because the deed showed the property was acquired as petitioner's separate property.

The documents relating to petitioner's equipment sales show that petitioner sold trailer equipment for $247,000 and received a check in that amount on January 20, 2005. The documents do not indicate how petitioner used the proceeds. The documents also show that petitioner sold 87 used trailers for $540,000 on February 3, 2005.[12] The buyer made the check payable to Pacific State Bank, and the payment satisfied petitioner's loan from Pacific State Bank. Finally, on April 28, 2005, Vito Transfer, LLC, sold 120 sets of "tomato tubs" for $156,856. The record does not indicate whether the buyer paid petitioner or Vito Transfer, LLC.

On December 10, 2007, Mr. Malcoun mailed to Ms. Martin copies of all deeds relating to petitioner's ownership of real property in Charter Way and Fresno, California, and stated that he was putting together an accounting of petitioner's use of the sale proceeds and hoped to forward the accounting to Ms. Martin the following week. Many of the enclosed documents related to property transfers that occurred as early as 1991, and some were only loosely related to petitioner's sales of property (e.g., petitioner included a certificate of lot line adjustment relating to one property and easements relating to another). None of the documents indicated how petitioner used the sale proceeds. Mr.

---

[12]It is unclear whether this sale was related to Two Vee Partners' sale of the Modesto real property, which also took place on Feb. 3, 2005.

Malcoun also informed Ms. Martin that his daughter remained gravely ill and he would be in and out of his office over the coming weeks. Ms. Martin made no further attempts to contact Mr. Malcoun. Ms. Martin reviewed the information and made the following notation on December 10, 2007, in her case activity record: "[Petitioner] sent me 2 packages of info I did not request with title history of property that was sold. I asked for disposition of [the] cash proceeds paid to * * * [petitioner] from these sales. Much of [the] info I have asked for has not been provided".

On December 20, 2007, having heard nothing from Mr. Malcoun for more than a week, Ms. Martin closed petitioner's file and recommended that petitioner's OIC be rejected and respondent's proposed collection action be sustained. In her case activity record Ms. Martin noted that she had given petitioner several extensions to provide information, petitioner had provided information she had not requested, and he had been evasive in what he did provide.

Also on December 20, 2007, Mr. Malcoun mailed a document to Ms. Martin relating to petitioner's loan from Pacific State Bank. The document showed that petitioner made principal payments to Pacific State Bank of $247,000 and $523,200, on January 25 and February 8, 2005, respectively. These payments, together with interest payments and late payment penalties, brought

petitioner's loan balance to zero as of February 15, 2005. Mr. Malcoun stated in an accompanying letter that he was still waiting for additional bank records to complete his accounting. Ms. Martin never received Mr. Malcoun's December 20, 2007, correspondence.

On January 18, 2008, respondent's Appeals Office issued a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (notice of determination) sustaining respondent's proposed levy. In an attached memorandum the Appeals Office summarized the facts of the case[13] and concluded that the NIL was issued in accordance with all statutory and procedural requirements and appropriately balanced the need for efficient collection of taxes with petitioner's concern that collection be no more intrusive than necessary. With respect to petitioner's OIC, the memorandum stated that the Appeals Office

> cannot consider the offer since * * * [the Appeals Office] [does] not have complete information and full financial disclosure. There is also concern whether the taxpayer is in full compliance for 2007 which was never verified. It is recommended that the offer be rejected due to lack of financial information and the collection actions sustained.

---

[13]The memorandum stated incorrectly that petitioner's amended OIC lowered his offer to $10,000 with respect to 2005. In fact, petitioner's amended OIC offered to settle his 2005 liability for $25,000 and his 2006 liability for $10,000; i.e., a total of $35,000. However, because petitioner's OIC was not rejected on this basis, the error does not affect our resolution of this case.

On the date she closed petitioner's file and recommended rejection of his OIC Ms. Martin had received only a fraction of the information requested in her October 22, 2007, letter.  Much of the information petitioner provided was beyond the scope of Ms. Martin's request, and petitioner failed to provide basic information that was within his control, e.g., a new Form 433-A, a statement explaining how he had used the proceeds from his real estate and equipment sales, financial information about Mrs. Ranuio, and an explanation of how he was meeting his basic monthly living expenses and whether he or Mrs. Ranuio expected to have income in 2007.

On February 19, 2008, petitioner filed a petition in this Court seeking review of respondent's notice of determination. Petitioner sought review of respondent's determinations with respect to 2005 and 2006.  Respondent moved to dismiss for lack of jurisdiction and to strike as to 2006 on the ground that he had not issued a notice of determination under section 6320 or 6330 to petitioner with respect to 2006.  We granted respondent's motion.  Accordingly, the only year at issue in this proceeding is 2005.

OPINION

## I.  Preliminary Matter:  Petitioner's Request for Judicial Notice

Petitioner requests that we take judicial notice that he has requested a collection due process hearing for 2006 and 2007 but that as of July 28, 2009 (the date petitioner filed his request), he had not received a hearing.  Rule 201 of the Federal Rules of Evidence allows a court to take judicial notice of adjudicative facts that are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Respondent concedes that petitioner requested a hearing with respect to 2006 and 2007 and that as of July 28, 2009, no hearing had been held.  Nevertheless, respondent urges us to deny petitioner's request as irrelevant. We agree with respondent.

The only year before the Court is 2005.  We fail to see how our taking notice that petitioner has requested but not yet received a hearing with respect to 2006 and 2007 is in any way relevant to the issues we must decide.  Accordingly, we decline to take judicial notice that petitioner has requested a hearing with respect to 2006 and 2007.

II.  Applicable Legal Principles

A.  Sections 6330 and 6331

If any person liable for any tax neglects or refuses to pay the tax within 10 days after notice and demand, the Secretary[14] may collect the tax by levy on all property and rights to property belonging to the taxpayer.  Sec. 6331(a); Murphy v. Commissioner, 125 T.C. 301, 307 (2005), affd. 469 F.3d 27 (1st Cir. 2006).  The Secretary must notify the taxpayer in writing of his intent to levy, sec. 6331(d), and of the taxpayer's right to a hearing, and such notice must be given at least 30 days before the levy may begin, sec. 6330(a).

If the taxpayer timely requests a hearing, the hearing shall be conducted by an impartial officer or employee of respondent's Office of Appeals.  Sec. 6330(b)(1), (3).  At the hearing the taxpayer may raise any relevant issue relating to the proposed levy, including (1) appropriate spousal defenses, (2) challenges to the appropriateness of collection actions, and (3) offers of collection alternatives.  Sec. 6330(c)(2)(A); Sego v. Commissioner, 114 T.C. 604, 609 (2000); Goza v. Commissioner, 114 T.C. 176, 180 (2000).  The taxpayer may also challenge the existence or amount of the underlying liability, but only if he or she did not receive a notice of deficiency or did not

_____

[14]The term "Secretary" means the Secretary of the Treasury or his delegate.  Sec. 7701(a)(11)(B).

otherwise have an opportunity to dispute the liability.  Sec. 6330(c)(2)(B).

Following the hearing, the Appeals Office must issue a notice of determination regarding the proposed collection action. In making the determination the Appeals Office must take into consideration:  (1) Verification presented by the Commissioner that the requirements of applicable law and administrative procedure have been met; (2) any relevant issue raised by the taxpayer; and (3) whether the proposed collection action appropriately balances the need for efficient collection of taxes with the taxpayer's legitimate concerns regarding the intrusiveness of the proposed collection action.  Sec. 6330(c)(3).

We have jurisdiction to review a notice of determination. Sec. 6330(d)(1).  Where the validity of the underlying tax liability is properly at issue, we review the determination regarding liability de novo.  Sego v. Commissioner, supra at 610; Goza v. Commissioner, supra at 181-182.  Where the validity of the underlying tax liability is not properly at issue, we review the determination for abuse of discretion.  Sego v. Commissioner, supra at 610; Goza v. Commissioner, supra at 182.  A determination will not constitute an abuse of discretion unless it is arbitrary, capricious, or without sound basis in fact or law.  Freije v. Commissioner, 125 T.C. 14, 23 (2005); see also

Swanson v. Commissioner, 121 T.C. 111, 119 (2003) (determination based on erroneous legal interpretation may be set aside as abuse of discretion); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

B.    Section 7122:  Offers-in-Compromise

The Secretary may compromise any civil or criminal case arising under the internal revenue laws.  Sec. 7122(a); Murphy v. Commissioner, supra at 308.  Section 7122(d) provides that the Secretary "shall prescribe guidelines for officers and employees of the Internal Revenue Service to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute."  The regulations issued pursuant to section 7122(d) set forth three grounds for an OIC:  (1) Doubt as to collectibility, (2) doubt as to liability, and (3) to promote effective tax administration.  Sec. 301.7122-1(b), Proced. & Admin. Regs.  The only ground that is relevant is doubt as to collectibility.

Doubt as to collectibility exists in any case in which the taxpayer's assets and income are less than the full amount of the liability.  Sec. 301.7122-1(b)(2), Proced. & Admin. Regs.  A determination of doubt as to collectibility includes a determination of the taxpayer's ability to pay the liability, taking into account the taxpayer's basic living expenses.  Sec. 301.7122-1(c)(2), Proced. & Admin. Regs.  The Secretary's evaluation of a taxpayer's basic living expenses takes into account not only the Secretary's published guidelines on national

and local living expense standards but also the taxpayer's individual facts and circumstances. Id. An OIC based on doubt as to collectibility generally is acceptable only if the offer reflects the taxpayer's reasonable collection potential; i.e., the amount the Commissioner could collect through administrative and judicial collection proceedings. Murphy v. Commissioner, supra at 309 (citing Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517).

Rev. Proc. 2003-71, supra at 517, which sets forth the procedures applicable to the submission and processing of offers to compromise a tax liability under section 7122, provides that an offer "should provide enough information for the * * * [Commissioner] to determine whether the offer fits within its acceptance policies." Id. sec. 4.02. The Internal Revenue Manual (IRM) provides that "An offer may be returned at any time during processing if the taxpayer fails to provide information necessary to determine whether it should be accepted." 1 Administration, IRM (CCH), pt. 5.8.7.2.2.2(1) (Sept. 1, 2005). Where a taxpayer fails to timely provide requested financial information, it is well settled that the Appeals Office may reject the taxpayer's OIC and sustain the Commissioner's proposed collection action. See infra pp. 27-28.

III. <u>Analysis</u>

    A.    <u>Standard of Review</u>

Petitioner concedes that the existence or amount of his 2005 Federal income tax liability is not at issue. Accordingly, we review respondent's determination for abuse of discretion. See <u>Sego v. Commissioner</u>, 114 T.C. at 610; <u>Goza v. Commissioner</u>, 114 T.C. at 182.

    B.    <u>Petitioner's Arguments</u>

Petitioner argues respondent abused his discretion in three distinct ways: (1) By requiring petitioner to provide financial information about Mrs. Ranuio; (2) by prematurely terminating petitioner's hearing when Ms. Martin knew Mr. Malcoun's daughter was gravely ill; and (3) by refusing to consider petitioner's OIC on the ground that petitioner was not in compliance with his 2007 tax obligations. Petitioner has the burden of proof with respect to each issue. See Rule 142(a).[15] For the reasons that follow, we conclude that petitioner's arguments are unavailing.

    1.    <u>Respondent's Request for Information About Mrs.</u>
          <u>Ranuio Was Not an Abuse of Discretion</u>

Where a taxpayer offers to compromise a liability for which the taxpayer's spouse has no liability, e.g., where the taxpayer did not file a joint Federal income tax return with his or her

---

[15]Petitioner does not dispute the Appeals Office's determination that the requirements of applicable law and administrative procedure have been met. See sec. 6330(c)(3).

spouse, the Commissioner generally will not consider the nonliable spouse's assets and income in determining the amount of an acceptable OIC. Sec. 301.7122-1(c)(2)(ii)(A), Proced. & Admin. Regs. However, a nonliable spouse's assets and income may be considered to investigate whether (1) property has been transferred from the taxpayer to the nonliable spouse under circumstances that would allow the Commissioner to collect the liability from the property, e.g., property conveyed in fraud of creditors; (2) property has been transferred from the taxpayer to the nonliable spouse for the purpose of removing the property from consideration by the Commissioner in evaluating the taxpayer's OIC; or (3) collection of the taxpayer's liability from the assets and income of the nonliable spouse is permitted under applicable State law, e.g., State community property law. Sec. 301.7122-1(c)(2)(ii)(A) and (B), Proced. & Admin. Regs. The Commissioner may also request information regarding the assets and income of a nonliable spouse for the purpose of verifying the amount of and responsibility for expenses claimed by the taxpayer. Sec. 301.7122-1(c)(2)(ii)(A), Proced. & Admin. Regs.

In arguing that the Appeals Office abused its discretion by requesting financial information about Mrs. Ranuio, petitioner relies on the general rule set forth in the regulations; i.e., the Commissioner will not consider a nonliable spouse's assets and income in determining the amount of an acceptable offer, but

ignores the exceptions, several of which are applicable. First, it is possible that petitioner transferred his interest in his residence to Mrs. Ranuio in order to prevent respondent from considering the property in determining the amount of an acceptable offer. See id. As respondent points out, the transfer may have been accomplished when petitioner knew that he had incurred, or was about to incur, a tax liability he would be unable to pay from his remaining assets. Petitioner has not explained why he transferred his interest in the residence to Mrs. Ranuio as her sole and separate property, nor has he explained when in 2005 he earned the income that generated his tax liability. Second, collection of petitioner's tax liability from the assets and income of Mrs. Ranuio is permitted under California community property law to the extent such assets and income are community property. In California married taxpayers' community property is liable not only for a couple's joint liabilities but also for either spouse's separate liabilities. Cal. Fam. Code sec. 910 (West 2004); Ordlock v. Commissioner, 533 F.3d 1136, 1138 (9th Cir. 2008), affg. 126 T.C. 47 (2006). Under California law "all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in * * * [California] is community property." Cal. Fam. Code sec. 760 (West 2004); see also Hanf v. Summers, 332 F.3d 1240, 1242-1243 (9th Cir. 2003) ("'there is a general

presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source'" (quoting <u>Haines v. Haines</u>, 39 Cal. Rptr. 2d 673, 681 (Cal. Ct. App. 1995))).

Petitioner observes that California allows married taxpayers to own separate property, which includes property owned by each spouse before marriage, Cal. Fam. Code sec. 770 (West 2004), and that married taxpayers may by written agreement transmute community property to the separate property of either spouse, with or without consideration,[16] Cal. Fam. Code sec. 850 (West 2004). Petitioner argues the residence he shared with Mrs. Ranuio is her separate property because he transmuted the property to her in January 2005. However, as mentioned above, petitioner has not explained the circumstances surrounding the transmutation, and Ms. Martin was not required to accept his assertion at face value. In any event, we need not decide whether the residence was community property or separate property under California law. It is enough to note that the character of the residence was unclear, and the deeds petitioner provided did not resolve the uncertainty to Ms. Martin's satisfaction.[17]

---

[16]A transmutation is subject to the laws governing fraudulent transfer. Cal. Fam. Code sec. 851 (West 2004).

[17]Petitioner's narrow focus on the residence is misplaced. Even if the residence was Mrs. Ranuio's separate property, any other assets Mrs. Ranuio acquired during her marriage to

(continued...)

Finally, the Commissioner may request financial information regarding a nonliable spouse for the purpose of verifying the amount of and responsibility for the expenses claimed by the taxpayer.  Sec. 301.7122-1(c)(2)(ii)(A), Proced. & Admin. Regs. That is precisely what happened:  Petitioner submitted an incomplete Form 433-A that showed he had no income, negligible assets, and monthly living expenses of $800.  Upon reviewing the Form 433-A, Ms. Martin requested financial information about Mrs. Ranuio in part to determine how petitioner was meeting his monthly living expenses.

We conclude that Ms. Martin's requests for information were reasonable and not an abuse of her discretion.

### 2. Respondent's Decision To Terminate Petitioner's Hearing Was Not an Abuse of Discretion

It is ordinarily not an abuse of discretion for an Appeals officer to reject an OIC and sustain the Commissioner's proposed collection action where the taxpayer has failed to submit requested financial information in a timely fashion.  See, e.g., Shanley v. Commissioner, T.C. Memo. 2009-17 (citing Prater v. Commissioner, T.C. Memo. 2007-241, Chandler v. Commissioner, T.C. Memo. 2005-99, and Roman v. Commissioner, T.C. Memo. 2004-20)).

---

[17](...continued)
petitioner are presumptively community property.  See Cal. Fam. Code sec. 760 (West 2004); Hanf v. Summers, 332 F.3d 1240, 1242-1243 (9th Cir. 2003).  Thus, it was not unreasonable for Ms. Martin to request financial information about Mrs. Ranuio.

In Shanley v. Commissioner, supra, we held that an Appeals officer did not abuse his discretion when he denied the taxpayer's request for more time to submit requested information, where the taxpayer did not provide any reason for his request. We acknowledged, however, that

> There might be reasons related to the season * * *, or reasons related to the information-gathering process (such as difficulty in getting information from third parties), or reasons personal to the taxpayer (such as sickness) that could make this a closer question * * *

Id. Petitioner argues that this case "falls squarely within the parameters where additional time should have been granted." We disagree.

First, contrary to petitioner's assertion, many of the documents Ms. Martin requested were within petitioner's control, and much of the information was within his personal knowledge. For example, petitioner failed to provide a completed Form 433-A, failed to explain how he was meeting his monthly living expenses, failed to account for the proceeds from his sales of real estate and equipment, and refused to provide financial information about Mrs. Ranuio, despite repeated warnings that failure to provide such information would result in rejection of his OIC. Moreover, Ms. Martin gave petitioner more than 2 months to obtain any necessary information from third parties and to provide the requested documents. Even allowing for the fact that Ms. Martin's request was extensive and that some of the requested

information may have required the cooperation of third parties, petitioner did not offer any credible reason why he failed to produce information that should have been readily accessible to him during the period allowed by Ms. Martin.

Second, we reject petitioner's suggestion that Ms. Martin unreasonably terminated petitioner's hearing knowing that Mr. Malcoun's daughter was gravely ill. We think the argument needs to be considered in its proper context. The record shows that Ms. Martin had been seeking documents and information from petitioner for more than a month when she first learned of Mr. Malcoun's daughter's illness. After learning Mr. Malcoun's daughter was hospitalized, Ms. Martin allowed petitioner an additional 2 weeks to submit the requested information. In all, Ms. Martin gave petitioner more than 2 months to supply the requested information before she closed his file. On the date she closed petitioner's file Ms. Martin had received only a fraction of the information she had requested. Petitioner had refused to provide information about Mrs. Ranuio, and Ms. Martin had little reason to believe the information would be forthcoming. Moreover, petitioner had failed to provide such basic information as a completed Form 433-A, a statement of how he was meeting his basic monthly living expenses and whether he had income in 2007 and an explanation of what he did with the proceeds--more than $650,000, according to the closing statements

Ms. Martin obtained--from his sales of real property and equipment in 2005 and 2006. Instead of disclosing the information, petitioner provided Ms. Martin with hundreds of pages of documents she had not requested, some of which related to property transactions that occurred as early as 1991, leading her to suspect petitioner was being evasive.

Petitioner might have preferred more time to provide the information, particularly in the light of Mr. Malcoun's daughter's illness. The problem with petitioner's argument is that Ms. Martin's decision can hardly be described as arbitrary, capricious, or without sound basis in fact or law. See Roman v. Commissioner, supra. Moreover, to the extent petitioner implies Mr. Malcoun's daughter's illness falls within the parameters discussed in Shanley v. Commissioner, supra, we note that the illness in question was not personal to petitioner or a member of his family and did not prevent petitioner from gathering the information readily available to him.[18]

### 3. Petitioner's Compliance or Lack of Compliance in 2007 Is Not Determinative

Finally, although the parties dispute whether petitioner complied with his 2007 tax obligations, we do not need to resolve

---

[18]We are not without sympathy for Mr. Malcoun. But Mr. Malcoun's daughter's illness does not excuse petitioner's failure to timely provide requested documents, nor does it explain petitioner's failure to timely provide information that was presumably within his personal knowledge.

this dispute.  The memorandum makes clear that petitioner's OIC was rejected because he failed to timely provide requested financial information and not because he failed to comply with his 2007 tax obligations.  In other words, even if the Appeals Office had been satisfied that petitioner was in compliance for 2007, the Appeals Office still would have rejected his OIC because of inadequate financial disclosures.  Petitioner's compliance or lack of compliance with his 2007 tax obligations simply was not a significant factor, let alone the decisive factor, in the Appeals Office's decision to reject petitioner's OIC.[19]

IV.  Conclusion

In summary, the Appeals Office allowed petitioner more than 2 months to provide the information necessary to evaluate his OIC.  The Appeals Office warned petitioner that failure to

---

[19]Even if petitioner's OIC had been rejected in whole or in part because of his alleged lack of compliance with 2007 tax obligations, we would still conclude the Appeals Office did not abuse its discretion.  A taxpayer's history of noncompliance is a valid basis for rejection of an OIC.  Martino v. Commissioner, T.C. Memo. 2009-43 (citing Londono v. Commissioner, T.C. Memo. 2003-99).  Ms. Martin asked petitioner on at least four occasions to provide information about his compliance with estimated tax obligations for 2007.  Although Mr. Malcoun asserted that petitioner would not have any income in 2007 and was not required to make estimated tax payments, he did not provide any evidence to corroborate his assertion.  The record demonstrates that Mr. Malcoun's assertion was incorrect.  Petitioner's 2007 Federal income tax return reported adjusted gross income of $91,442, and there is no evidence petitioner made any estimated tax payments for 2007.

provide such information in a timely fashion would result in rejection of his OIC.  Despite these warnings, petitioner failed to provide a completed Form 433-A, failed to explain how he was meeting his basic monthly living expenses, failed to account for the proceeds from his real property and equipment sales, refused to provide information about his wife's finances, and failed to provide other requested information.  Instead, petitioner provided reams of information the Appeals Office had not requested, a gesture Ms. Martin considered evasive.  Taking into account all of these facts and circumstances, we hold that the Appeals Office did not abuse its discretion by rejecting petitioner's OIC, terminating petitioner's hearing, and sustaining the proposed levy.

We have considered the remaining arguments of both parties for results contrary to those discussed herein, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered for respondent.