Filed 5/15/14  Marriage of Holzman and Seidel CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of STACY HOLZMAN and ALEXANDER SEIDEL. | |
| STACY HOLZMAN,  Appellant,  v.  ALEXANDER SEIDEL,  Respondent. | A136969  (City & County of San Francisco Super. Ct. No. FDI-08-767936) |

Stacy Holzman (Stacy)[1] appeals from the trial court's ruling in her marital dissolution action with Alexander Seidel (Alex) that a Community Property Agreement (CPA) they signed during the marriage was unenforceable.[2]  She contends the judgment must be reversed because:  (1) the trial court's statement of decision was deficient for

---

[1]We refer to the parties by their first names, as is customary in family law matters. No disrespect is intended by this practice.  (See *In re Marriage of Witherspoon* (2007) 155 Cal.App.4th 963, 967, fn. 2.)  Alexander was referred to as Alex below, and we shall do the same.

[2]In an Amended Statement of Decision filed October 23, 2012, the trial court certified the following issue "for immediate appellate review":  "Is the [CPA] executed by the parties on August 28, 2003 valid and enforceable?"  (See Fam. Code, § 2025 [a Court of Appeal may hear and decide an issue that has been bifurcated for trial before disposition of the entire case if "the court that heard the issue . . . certifies that the appeal is appropriate"]; Cal. Rules of Court, rule 5.180 [the Court of Appeal may accept an issue for review once it is certified for appeal].)

1

several reasons; and (2) the trial court erred in ruling that Stacy had " 'an affirmative duty to assure' " that Alex understood the effect of the CPA. We reject the contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Stacy and Alex met in May 1983. They became engaged in June 1985 and were married on April 12, 1986. They have no children. At the time of marriage, Alex owned a five-unit apartment building on Washington Street (Washington Street), funds gifted to him by his parents and grandparents, and an interest in a closely held business known as Seidel Tanning.

During the marriage, the parties were business partners as well as marital partners. Stacy testified that their "lives were very closely intertwined," and that they spent an estimated 95 percent of their time together. Alex testified that he and Stacy were "very much companions on an almost 24/7 basis." Together, they operated Seidel/Holzman, a successful architectural and design firm. They managed Washington Street as a rental business and extensively remodeled all of the units over the course of many years. They purchased additional real property in Belvedere and Glen Ellen. From 1998 to 2003, they were parties to a litigation involving Washington Street.[3] After the litigation, they reduced the number of Washington Street units from five to three, and construction for that project was completed in November 2008.

The parties first met with estate planning attorney Richard Nelson in 1996 with the goal of developing an estate plan. Nelson had been working as an estate planner since 1972; he did not practice family law. The parties signed a conflict of interest waiver with Nelson so that he could represent both of them. After meeting with the parties, Nelson created initial drafts of the parties' wills, a revocable trust, and powers of attorney. The

---

[3]In December of 1998, construction on the adjoining lot caused a subsidence that cracked the Washington Street foundation, which in turn caused a hole in its backyard. The developers of the adjacent lot sued Alex, alleging that the Washington Street property was liable for the compromised soil and related foundational issues. Alex filed a cross-complaint in 2001 against both his insurance company and his neighbors in connection with the subsidence. The Washington Street litigation ended in 2003.

parties did not complete their estate plan at that time and continued to review and revise it with Nelson sporadically over the course of the next seven years.

Stacy testified that she and Alex jointly talked to Nelson about their assets, including how they were held, and the concept of community property. Nelson testified that throughout his representation of the parties, Stacy was the "point person" "[a]s between Alex and Stacy," who primarily assisted Nelson "with the exchange of financial information." Alex testified that Stacy was "the primary point person" who dealt with Nelson and conveyed the parties' financial information to Nelson.

In 1999, the parties met with Nelson to review and revise the estate plan documents he had drafted in 1996. During the course of these meetings, Nelson prepared, among other documents, an updated revocable trust, designated as the SASH99 Trust.[4] The parties did not execute the SASH99.

Four years later, on August 14, 2003, the parties met with Nelson to further discuss their estate plan. Based on that meeting, Nelson revised the SASH99 Trust and renamed it the SASH03 Trust. On August 18, 2003, Nelson sent a letter to the parties describing the revisions that had been made to the trust. At the end of the letter, Nelson wrote, "Please let me know if you have questions or any other changes and we will then get everything ready for your signatures." Nelson testified that as of that date, it appeared "things were finally getting to a place where they could be finalized."

Then, on August 21, 2003, Stacy sent an email to Nelson and attached a document to the email that described Washington Street as community property. Nelson, who knew that title to Washington Street was held in Alex's name only at the time, viewed Stacy's email as a directive to him to do what was needed to change the characterization of Washington Street to community property. Nelson replied to the email on August 22, 2003 stating, "Thanks Stacy. This is very helpful." He further stated in the email, "We should also prepare a simple form of community property agreement for the Washington

---

[4]The letters denote the parties' combined initials, and the numbers denote the year the draft document was created.

Street property if it is to be community property." He added, "I suggest next Thursday or Friday morning as a time for getting together again to sign."

Nelson drafted the CPA on August 22, 2003. He did not recall having a conversation with the parties about "the concept of a Community Property Agreement" before that date; the transmutation of Washington Street into community property was not necessary in order to effect the objectives of the estate planning documents. On August 27, 2003, Nelson spoke to Stacy on the telephone and they discussed the "extent of community property," i.e., that "more than Washington Street was going to be covered in the Community Property Agreement." Nelson revised the CPA based on that conversation. The revised CPA transmuted almost all of Alex's separate property into community property, and also included a waiver of Alex's reimbursement rights under Family Code section 2640.[5] Nelson included a waiver under Family Code section 2640 because he thought it was "better practice" to do so, even though most other estate planning attorneys did not agree with him.

Nelson testified that the CPA "conferred" "advantages" "upon Stacy," and that by signing the CPA, Alex was "making large gifts to Stacy." Nelson did not advise Alex to seek independent counsel about the terms and provisions of the CPA. There was nothing in the billing entries indicating Nelson had sent any of the drafts of the CPA to Alex. Nelson did not direct either party to obtain appraisals of real estate or attempt to quantify the value of Alex's separate property interest in Washington Street, or in any of his other separate property. Nelson also never discussed with Alex the concept of a waiver of his separate property reimbursement rights under Family Code section 2640.

On August 28, 2003, the parties met with Nelson at his office and signed various documents—the SASH03 Trust, delegation of trustees' powers, wills, the CPA, and deeds transferring Belvedere, Washington Street, and Glen Ellen to the trust. A document that listed the trust's assets was attached to the SASH03 Trust as Exhibit A.

---

[5]Family Code section 2640, subdivision (b), provides that a party is entitled to reimbursement for traceable separate property contributions to the community unless he or she has waived the right to reimbursement in writing.

4

Exhibit A characterized as community property the parties' real property, including Washington Street, their bank and investment accounts, and their tangible and intangible personal property. It characterized the Quad/Graphics stock as "Seidel Property."

Stacy testified that although she was the one who prepared Exhibit A, she had discussed with Alex what was to be included in the document, and that he had reviewed the various iterations, including the draft she emailed to Nelson on August 21, 2003. Alex testified that he did not see Stacy's draft of Exhibit A before the August 28, 2003 meeting, and did not know Stacy had been in touch with Nelson between their August 14, 2003 meeting and the August 28, 2003 signing. He testified that he had no communication with Nelson between August 18, 2003—the date of Nelson's letter to the parties describing the revisions that had been made to the trust—and August 28, 2003. He understood Washington Street to be his separate property, and Stacy never discussed with him the possibility of his transmuting Washington Street into community property. Stacy did not tell him she had received an email from Nelson suggesting a CPA, and did not tell him she had a telephone conversation with Nelson on August 27, 2003, regarding the extent of community property.

Alex further testified that he believed the purpose of the August 28, 2003 meeting was to execute the documents they had reviewed at their August 14, 2003 meeting. He did not review the documents that were presented to him on August 28, 2003 for signature because he believed they were the same ones they had discussed on August 14, 2003. Nelson did not tell him that he was signing an entirely new agreement that had been prepared in the last day or so. Neither Stacy nor Nelson told him that he was transmuting his separate property into community property, and no one quantified the amount of the gift he was making by virtue of the CPA. No one explained to him the legal significance of the CPA. Had he known that the CPA would have resulted in millions of dollars of gifts to Stacy, and that it would have gifted distributions he had received from his father's estate to the community, he would not have signed it. He would have also refused to sign the CPA if he had known it was unnecessary to affect the

5

goals of the estate plan. He testified that no one told him that a conflict of interest existed by virtue of the CPA nor suggested that he consult with independent counsel.

Nelson testified that it was—and is—his custom and practice to: (1) lay out all of the documents to be signed on a conference table, separated by type of document; (2) identify and review each document individually with the clients, to ensure that they understood what they were signing; (3) ask the clients to read the documents; (4) review core provisions with the clients; and (5) ask the clients if they have any questions. It was his practice to prepare documents that reflected the goals of his clients, and he believed his work for Stacy and Alex reflected their goals. Stacy testified that Nelson reviewed each document with her and Alex, including Exhibit A that characterized the trust assets as community or separate property. Alex testified that Nelson never discussed the CPA with them. Nelson estimated that of the 1.1 hours he billed on August 28, 2003, 10 or 15 minutes, "[i]f that," were spent reviewing and preparing the documents. Nelson had no recollection of discussing the CPA with Alex, or of explaining to him that by signing the CPA he would be transmuting his separate property into community property. Nelson did not recall explaining to Alex the disadvantages he would suffer by signing the CPA.

Stacy and Alex separated on January 12, 2008. Alex filed a petition for dissolution of their marriage and served Stacy on September 4, 2008. Stacy filed her responsive papers on November 7, 2008. On December 8, 2011, the court[6] issued an order bifurcating the following issue for separate trial: "Is the [CPA] executed by the parties on August 28, 2003 valid and enforceable?"

A trial on the bifurcated issue began on January 30, 2012, and continued for 11 nonconsecutive days until May 3, 2012. The court filed its Memorandum of Intended Decision on August 2, 2012. Alex's counsel served a Proposed Statement of Decision on August 21, 2012. Stacy timely objected to both the court's Memorandum of Intended Decision and Alex's Proposed Statement of Decision. The trial court thereafter issued its

---

[6]On February 24, 2011, the parties agreed to appoint a temporary judge to hear and determine all issues in this matter until the final determination of the case.

own Statement of Decision in which it adopted its Memorandum of Intended Statement of Decision, almost verbatim.

The trial court stated in its Statement of Decision that the CPA was valid but unenforceable. The court first noted that under Family Code section 852, subdivision (a), a transmutation of real or personal property is invalid unless made in writing. The court found the CPA was "clear, concise and unequivocal in its terms" and that it met "all of the requirements of . . . section 852." It further found that "Alex freely executed the CPA, with no apparent pressure from Stacy to do so," and that there was "no direct evidence that Stacy intentionally misled Alex regarding the purpose and effect of the CPA during the estate planning process."

The court stated, however, that under Family Code section 721 and case law, a presumption of undue influence arises whenever there is an interspousal transaction in which one spouse obtains an advantage over the other, e.g., when he or she gains or benefits from the transaction. (*Citing e.g., In re Marriage of Haines* (1995) 33 Cal.App.4th 277 [title presumption was trumped by the presumption of undue influence because the interspousal transaction resulted in one spouse gaining an advantage over the other]; *In re Marriage of Delaney* (2003) 111 Cal.App.4th 991.) The court found the presumption of undue influence applied and that Stacy therefore had the "burden of proving, by a preponderance of the evidence, that [Alex] entered into the transaction freely, voluntarily, and with a complete knowledge and understanding of the facts."

The court found that Stacy had failed to meet her burden because there was substantial evidence that "Alex did not execute the CPA with sufficient knowledge or understanding of its purpose and effect" and that he had "little or no appreciation of the resulting consequences." In so finding, the court relied on the following four facts: (1) Alex first saw the CPA at the document signing meeting with Nelson on August 28, 2003; (2) Alex did not have independent counsel review the CPA to explain the consequences of executing it; (3) Nelson testified that he did not discuss with the parties, at any of their meetings, what the effect of the CPA would be in the event of a dissolution of marriage; and (4) Nelson included a wavier of the right to reimbursement under

7

Family Code section 2640 without explanation and believed it was " 'better practice' " to include the waiver even though "most other estate planning attorneys did not agree with him." The court concluded: "In summary, Alex freely executed the CPA, with no apparent pressure from Stacy to do so, but also with little or no appreciation of the resulting consequences. In order to rebut the presumption of undue influence, Stacy had an affirmative duty to assure his understanding. The evidence produced at trial does not demonstrate that she met this burden."

On October 23, 2012, the court filed an Amended Statement of Decision in which it corrected a clerical error and certified the bifurcated issue for appeal. Stacy timely appealed.

## DISCUSSION

### I. Statement of Decision

### A. General principles

A trial court judgment is generally "presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [citations omitted].) However, the application of the foregoing inferences in favor of the judgment can be avoided by a statement of decision. (*Ibid.*) Thus, when requested to do so by a party, a trial court must issue a statement of decision explaining the factual and legal basis for its decision as to each principal controverted issue at trial. (Code Civ. Proc. § 632; *In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 359; *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 353–354.)

A statement of decision provides a reviewing court with "the trial court's reasoning on disputed issues, and 'is [the reviewing court's] touchstone to determine whether or not the trial court's decision is supported by the facts and the law.' " (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 287.) A statement of decision that fails to make factual findings necessary to resolve disputed material issues is "inadequate as a matter of law" provided timely objections are made. (*In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 453; see *In re Marriage of Arceneaux*, *supra*, 51 Cal.3d at pp. 1133–

8

1134.) When a trial court fails to make the explanation required by Code of Civil Procedure Section 632, "reversible error results." (*In re Marriage of Hoffmeister*, *supra*, 191 Cal.App.3d at pp. 359–360.)

It is for the trial court to determine what the principal controverted issues—i.e., those on which the outcome of the case turns—are. If findings are made on issues that determine the case, other issues become immaterial and a failure to make additional findings does not constitute prejudicial error. (*Vukovich v. Radulovich* (1991) 235 Cal.App.3d 281, 295.) Expressed another way, the trial court need not discuss each question listed in a party's request; rather, all that is required is an explanation of the factual and legal basis for the court's decision regarding the principal controverted issues at trial as such are listed in the request. (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230; *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118.) A failure to find on an immaterial issue is not error nor is a judge required to make a finding outside the pleadings. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599.) "[A] trial court rendering a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them. [Citation.]" (*Ibid*.)

### B. Contention

Stacy contends the trial court's statement of decision was " 'inadequate as a matter of law' " because it did not set forth the court's factual findings related to resolving the following controverted issues: "(1) whether Alex should be estopped from challenging the CPA; (2) whether he breached his fiduciary duty by self-dealing and constructive fraud; and (3) whether Stacy gained an unfair advantage from the CPA." She asserts the statement of decision was also flawed because the court based its ruling on an "assumed factual contention that Alex did not proffer, i.e., that he knew he signed the CPA but did not understand its effect."

9

### 1. Equitable Claims

Stacy contends the statement of decision was inadequate because the trial court failed to address her argument that Alex should have been estopped from challenging the CPA. The record, however, shows the court considered Stacy's equitable claims and made the requisite findings. For example, the court stated, "Stacy contends that various equitable principles (estoppel, ratification, detrimental reliance, latches, unclean hands and unjust enrichment) preclude Alex from contending that the CPA is invalid." "While these equitable concepts are cast as different theories (estoppel, ratification, latches, unclean hands) they all turn on the underlying factual contention that Alex made ongoing oral promises as well as a written 'promise' (the CPA) to transmute his separate property to community property and that Stacy relied, to her detriment, on these promises."

The trial court then went on to correctly point out that an agreement transmuting separate property into community property must be in writing and cannot be created by estoppel or other equitable principles. (Citing Fam. Code, § 852, subd. (a) [transmutation of property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest is adversely affected]; *In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1104 [there is "no exception to the requirement of an 'express' written declaration"].) The court rejected Stacy's argument that estoppel applied, stating, "The CPA was a valid agreement rendered unenforceable the moment it was signed due to the presumption of undue influence arising from the circumstances attendant to its execution . . . [E]quitable claims rooted in detrimental reliance [may not] be used to revive an agreement determined to be unenforceable." We conclude the trial court adequately addressed Stacy's equitable claims.

In addition to attacking the statement of decision on procedural grounds, Stacy appears to also raise a substantive challenge to the trial court's legal conclusion that equitable principles could not be used to preclude Alex from challenging the CPA. She suggests, for example, that it was unfair for Alex to be allowed to challenge the CPA after having "enjoyed the benefits of the CPA for over five years, namely the dedication of Stacy's time, effort and skills and the investment of community resources towards the

10

maintenance, protection, and improvement of Washington Street." She asserts, "Both parties relied on their reasonable expectations that the CPA was valid and enforceable, and they conducted themselves consistently with its terms." The problem with Stacy's argument is that it rests on the assumption that Alex understood the effect of the CPA at the time he signed it—a factual finding the trial court did not make.

The cases on which Stacy relies in support of her argument are readily distinguishable. In *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 749, 751–752, the Court of Appeal affirmed the trial court's determination that the wife was precluded on equitable grounds from challenging a postnuptial agreement where the agreement was both valid and enforceable. In that case, the trial court found that the presumption of undue influence did not apply because both parties benefited from the agreement, and that even if the presumption applied, the husband had overcome the presumption with evidence that the wife—who was represented by three certified family law specialists and various experts during the negotiation of the agreement—had entered into the agreement freely and willingly and with full knowledge of all of the facts and an understanding of the legal effect of the agreement. (*Id*. at pp. 751–752.) In contrast, here, as noted, the trial court found there was insufficient evidence that Alex understood the legal effect of the CPA at the time he signed it.

*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, on which Stacy also relies, is similarly distinguishable. There, after jury trial began and a jury was selected, the parties engaged in mediation and reached a settlement. (*Id.* at p. 42.) The parties informed the court that they had reached a settlement, that there were just "a few things [left] to do" to finalize the agreement, and that the jury could be dismissed. (*Id*. at p. 43.) Based on that representation, the court thanked and dismissed the jury. (*Id*. at p. 44.) Thereafter, one of the parties, Blix Street, represented by new counsel, challenged the settlement agreement on several grounds, one of which was that the agreement constituted an unenforceable contract. (*Id*. at p. 45.) Noting that the trial court had dismissed the jury based on the parties' representation that they had reached an enforceable settlement agreement, the Court of Appeal concluded that Blix Street was

11

estopped from arguing that the settlement agreement was unenforceable. (*Id*. at p. 51.)
In so concluding, the Court of Appeal stated, "There is no indication that Blix Street took
the first position—that the contract was enforceable—*as a result of ignorance, fraud, or
mistake . . .* Accordingly, the doctrine of judicial estoppel legally could be applied in this
case." (*Id.* at p. 51, italics added.) In contrast, here, there was evidence that Alex entered
into the CPA as a result of ignorance, i.e., because he did not understand the effect of the
CPA at the time he signed it. *Blix Street Records, Inc. v. Cassidy* in which there was no
such evidence, does not support Stacy's contention that Alex should have been estopped
from challenging the CPA.[7]

### 2. Breach of Fiduciary Duty and Constructive Fraud

Stacy contends the statement of decision was inadequate because the trial court
failed to address her argument that Alex breached his fiduciary duty to her and engaged
in constructive fraud. The record shows, however, that the court considered this
argument when it stated, "[Stacy] concludes that Alex's failure to honor his promises
[under the CPA] constituted a breach of his fiduciary duty to Stacy pursuant to Family
Code Section 721 [fiduciary duty], and therefore should preclude him from denying the
validity of the CPA." The court went on to find that Alex's claim that the CPA was
unenforceable was meritorious, thereby rejecting any argument Stacy had made regarding
a breach of fiduciary duty or constructive fraud. The court adequately addressed the
issue.

---

[7]Stacy spends a significant portion of her brief setting forth in detail the time,
energy, and effort she put into improving Alex's separate property during their marriage,
both before and after the signing of the CPA. We note, however, that this is not directly
relevant to the narrow issue before us in this appeal, i.e., whether the CPA was
enforceable. As the trial court stated below, its order does not necessarily extinguish
Stacy's equitable claims. "[I]t may be that Stacy can successfully assert her claims of
detrimental reliance and unjust enrichment in another context in this case. Additionally,
she may be able to demonstrate that the community is entitled to a *Moore/Marsden*
interest [increased value] in certain assets, and/or that the community may be entitled to
reimbursement for its contributions to Alex's separate property. These are all
considerations that do not fall within the purview of the single, bifurcated issue that was
the subject of this trial."

As to the merits of Stacy's claim that Alex breached his fiduciary duty to her and engaged in constructive fraud by even challenging the CPA, she has cited—and we have found—no authority supporting the position that a party in a marital dissolution action breaches his fiduciary duty and engages in constructive fraud simply by challenging an agreement he believes is invalid or unenforceable.

### 3. Advantaged Spouse

Stacy contends the statement of decision was inadequate because the trial court failed to "make any factual findings as to whether Stacy actually gained an advantage over Alex. It simply proceeded to its undue influence analysis." We reject the contention.

Here, the statement of decision set forth the trial court's factual findings regarding the parties' property and financial status as the time of marriage, including the fact that Alex had significant assets, i.e., separate property, at the time of marriage. The court also found that the CPA purported to transmute almost all separate property to community property, and that it included a waiver of the right to reimbursement under Family Code section 2640. The court then set forth the law that a presumption of undue influence arises whenever there is an interspousal transaction that results in one spouse obtaining an advantage over the other. Noting that case law has defined "advantage" to mean "obtains a favorable opportunity, or otherwise gains, benefits, or profits," the court applied the presumption of undue influence to the facts before it, finding that Stacy had failed to rebut the presumption. Although the trial court did not specifically state that Stacy was the advantaged spouse before proceeding to apply the presumption, we conclude the statement of decision sufficiently delineated the factual and legal basis of the court's ultimate decision that the CPA was unenforceable due to the presumption of undue influence and Stacy's failure to rebut the presumption. (See *Hellman v. La Cumbre Golf & Country Club, supra,* 6 Cal.App.4th at p. 1230 [all that is required in a

13

statement of decision is an explanation of the factual and legal basis for the court's decision regarding the principal controverted issues at trial].)[8]

In any event, even if the court erred by not specifically stating that Stacy was the advantaged spouse before proceeding to its undue influence analysis, any error was harmless. "Even [where] a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings. . . . [Citation.]" (*Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525.) Here, it was virtually undisputed that Stacy was the one as between the two parties who benefited from the parties' signing of the CPA. Alex, not Stacy, was the one who owned significant property—separate property—before the marriage, and the CPA would have resulted in Alex giving significant gifts to Stacy had it been upheld. Stacy has presented no evidence to show she was harmed in any way by the trial court's alleged failure to find that she was the advantaged spouse or that the advantage she gained was "unfair."

### 4. Factual Contention Never Proffered

Stacy contends the statement of decision was deficient because the trial court based its ruling on a "factual contention that Alex never proffered." She asserts that because Alex's position at trial was that he never signed the CPA and was unaware it existed, it was error for the court to base its ruling on a finding that Alex freely signed— but did not understand the legal effect of—the CPA. We reject the contention.

---

[8]Stacy's counsel argued at oral argument that the trial court refused to find that she gained an "unfair" advantage. Although the court did not use the word "unfair" to describe any advantage that was gained, there is nothing in the record indicating that the court *refused* to find that the advantage was unfair. To the extent Stacy is arguing there was insufficient evidence to support a finding that she gained an "unfair" advantage, we conclude the argument is without merit. *In re Marriage of Burkle*, *supra*, 139 Cal.App.4th 712, on which she relies does not support her position. There, the court held that the presumption of undue influence did not apply where an agreement provided "mutual advantages" to the spouses, because such an agreement was neither "unfair" nor "inequitable." (*Id.* at p. 735.) Here, in contrast, the court did not find the CPA provided "mutual advantages," and we find no support in the record for such a finding.

14

Stacy cites no authority to support her position that a trial court errs—or that a statement of decision is deficient—where the court bases its ruling on a theory that is different from one that a party has presented.  She cites *In re Marriage of Hoffmeister*, *supra*, 191 Cal.App.3d at pages 360–361, for the proposition that a court cannot base its finding on "an assumption unsupported by the record," but the case is inapposite, as there is nothing in the present case indicating that the court based its ruling on such an "assumption."

In any event, we do not believe the trial court's finding was as inconsistent with Alex's position as Stacy asserts it was.  Alex never disputed that he signed the CPA, i.e., that the signature on the CPA was his.  Rather, his position was that he did not know he signed a document in which he gifted so much of his separate property to Stacy.  This was tantamount to saying he did not realize he had signed the CPA, i.e., that he did not understand its effect—precisely what the trial court found in concluding that Stacy had failed to meet her burden of rebutting the presumption of undue influence.

### II. Burden to Show Alex Understood Agreement

Stacy contends the trial court erred when it stated in its statement of decision that she had " 'the affirmative duty to assure [Alex's] understanding' " of the CPA.  She correctly points out that she was "not required to voir dire Alex regarding the execution of each document" at the time of signing, and argues, "The trial court imposed upon Stacy an affirmative duty that she did not legally have.  The trial court's decision must be reversed as legally erroneous if it based its finding on a requirement that Stacy had to assure that Alex understood the legal effect of the CPA before he signed it."

Stacy is challenging the following portion of the statement of decision:  "In summary, Alex freely executed the CPA, with no apparent pressure from Stacy, but also with little or no appreciation of the resulting consequences.  In order to rebut the presumption of undue influence, *Stacy had an affirmative duty to assure his understanding*.  The evidence produced at trial does not demonstrate that she met this burden."  (Italics added.) We conclude there was no error because it is apparent—in the context of the paragraph, and of the entire statement of decision—that the trial court was

15

referring to Stacy's duty *at trial* to prove that Alex understood the CPA, not that the court was stating she had the affirmative duty, *at the time of the signing*, to make sure Alex understood the legal effect of the CPA.  The trial court articulated the law correctly in the statement of decision when it stated, "Once the presumption of undue influence arises, the advantaged spouse bears the burden of proving, by a preponderance of the evidence, that the disadvantaged spouse entered into the transaction freely, voluntarily, and with a complete knowledge and understanding of the facts."  The court went on to explain how the evidence was insufficient to show that Alex understood the legal effect of the CPA at the time he signed it.  In other words, the court found that Stacy had failed to meet her burden of rebutting the presumption of undue influence.  Although perhaps not articulated in the most artful way, the trial court's statement did not improperly impose upon Stacy a duty to assure Alex's understanding of the CPA at the time of signing.

**DISPOSITION**

The judgment is affirmed.  Respondent shall recover his costs on appeal.


_____

McGuiness, P.J.



We concur:


_____

Pollak, J.



_____

Siggins, J.



16